UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

AUG 28 1998

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA, <u>ex</u> <u>rel.</u>
ROBERT R. PURCELL
59 Little Harbor Way
Deerfield Beach, Florida  33441

        Plaintiff,

    v.

MWI CORPORATION
201 North Federal Highway
Deerfield Beach, Florida  33441

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civ. A. No._____

COMPLAINT

DEMAND FOR JURY TRIAL

▬▬▬▬▬▬▬▬▬▬

**CASE NUMBER  1:98CV02088**

**JUDGE:** Ricardo M. Urbina

**DECK TYPE:** Civil General

**DATE STAMP:** 08/28/98

JURY ACTION

**COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES
UNDER THE FEDERAL FALSE CLAIMS ACT,
TITLE 31, UNITED STATES CODE SECTION 3729, <u>ET</u> <u>SEQ</u>.**

2



The plaintiff, Robert R. Purcell, brings this <u>qui tam</u> action on his behalf and on behalf of the United States of America and, upon information and belief, based upon investigation and documentary evidence, except as to allegations that concern the plaintiff personally, complains of the defendant, MWI Corporation, as follows:

## I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States of America arising from knowingly false or fraudulent claims presented or caused to be presented by DEFENDANT MWI CORPORATION (hereinafter "MWI") (f/k/a Moving Waters Industries Corporation; M&W Pump Corporation; M&W Pump Works Incorporated), 201 North Federal Highway, Deerfield Beach, Florida  33441, against the United States, in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729-32, as amended, Pub. L. No. 99-562, 100 Stat. 3153 (1986).  Jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

2.    The False Claims Act, originally enacted in 1863 during the United States Civil War, was substantially amended by the False Claims Amendments Act of 1986, which was signed into law on October 27, 1986.  Congress enacted these new amendments to enhance the Government's ability to recover losses sustained as a result of fraud against the United States.  Congress acted after

3

finding that such fraud in federal programs, procurement, and in the payment of obligations owed to the Government is pervasive, and that the False Claims Act, which is characterized as the primary tool for combating fraud against the Government, was in need of modernization.  These amendments were intended by Congress to create incentives for individuals who are aware of fraud against the Government to disclose that information without fear of reprisals or Government inaction.

3.   As amended, the False Claims Act provides, <u>inter alia</u>, that any person who, with actual knowledge, in reckless disregard or in deliberate ignorance of the truth, presents, or causes to be presented, a false or fraudulent claim to the United States Government for payment or approval, or who makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government, is liable to the Government for a civil penalty of not less than $5,000 and not more than $10,000 for each claim, plus three times the amount of the damages sustained by the Government because of the false claim.  The Act allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for himself and for the United States Government, and to share in any recovery.  The complaint is to be filed under seal for 60 days (without service on the defendant during the 60-day period) to enable the Government (1)

to conduct its own investigation without the knowledge of the defendant, and (2) to determine whether to join the suit.  At the same time, the plaintiff must provide to the Attorney General of the United States written disclosure of substantially all material evidence and information in plaintiff's possession.

4.    Based on these provisions, plaintiff seeks through this action to recover damages and civil penalties arising from false claims for payment by the United States Treasury (i) which, in the first instance, DEFENDANT MWI caused to be (or will cause to be) submitted by the Federal Ministry of Finance and Economic Development of the Federal Republic of Nigeria (also referred to herein as the "Nigerian Federal Government") under the direct loan and/or loan guarantee programs of the Export-Import Bank of the United States (hereinafter "Exim Bank") and (ii) which, subsequent to loan approvals and commitments by Exim Bank, DEFENDANT MWI submitted (or will submit) through Exim Bank's commercial intermediary as deliveries to Nigeria were (or are) cleared for shipment.  Plaintiff believes the amount of such damages and civil penalties that may be assessed against the DEFENDANT MWI under the facts as alleged in this complaint to be substantial.

5.    As required under the False Claims Act, 31 U.S.C. 53730(b)(2), Plaintiff has provided to the Attorney General of the United States and to the United States Attorney for the

District of Columbia, simultaneously with the filing of this complaint, written disclosure of substantially all material evidence and information related to the complaint.

## II.  **PARTIES**

6.   PLAINTIFF ROBERT R. PURCELL (hereinafter "Purcell"), is a resident of Deerfield Beach, Florida, and, during the time relevant to most of the allegations herein, was employed as Vice President of National Sales and, subsequently, Director of Asian Operations for DEFENDANT MWI.  Purcell's principal role at MWI as Vice President of National Sales was to develop a national distribution network for the company's products.  As Director of Asian Operations, Purcell developed the company's sales and distribution networks throughout Southeast Asia.  PLAINTIFF PURCELL brings this action for violations of 31 U.S.C. § 3729 <u>et</u> <u>seq</u>., on behalf of himself and the United States Government pursuant to 31 U.S.C. § 3730(b)(1).

7.   DEFENDANT MWI is a corporation chartered under the laws of the State of Florida, with corporate headquarters at 201 North Federal Highway, Deerfield Beach, Florida  33441.  MWI is a manufacturer, assembler, and distributor of pumping equipment and related items used primarily for irrigation and drainage purposes.

III. **JURISDICTION AND VENUE**

8.   This is a civil action arising under the laws of the United States to redress violations of Title 31 U.S.C. § 3729, also known as the "False Claims Act." As such, this Court has jurisdiction over the subject matter of this action pursuant to Title 28 U.S.C. §§ 1331, 1345 and Title 31 U.S.C. § 3732, which specifically confer jurisdiction on this Court for actions brought pursuant to § 3729 of Title 31.

9.   This Court has personal jurisdiction over DEFENDANT MWI pursuant to 31 U.S.C. §3732(a) because DEFENDANT MWI, through its officers, employees and/or other agents, caused false and fraudulent statements and records to be submitted to the United States Government through its billing facilities, and/or made, used, or caused to be made or used false records in this District to get false or fraudulent claims approved and paid by the United States Government and/or conspired in this District to defraud the United States Government by getting false or fraudulent claims approved and paid.

10.   Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because (a) DEFENDANT MWI transacts or has transacted business in the District of Columbia; and (b) the DEFENDANT MWI caused false and fraudulent statements and records to be submitted to United States Government agencies (e.g., the Export-Import Bank of the United States (hereinafter "Exim Bank"),

located at 811 Vermont Avenue, N.W., Washington, D.C.  20571;
telephone 800/565-EXIM), located in this District, and/or made,
used, or caused to be made or used false records in this District
to get false or fraudulent claims approved and paid by the United
States Government and/or conspired in this District to defraud
the United States Government by getting false and fraudulent
claims approved and paid.

IV.  <u>ALLEGATIONS</u>

<u>OVERVIEW</u>

11.  This case involves sales of pumping equipment and
related items by MWI to various State Governments within the
Federal Republic of Nigeria.  Most or all of the subject sales
were financed through direct loans and/or loan guarantees
provided by Exim Bank.  The subject loans and/or loan guarantees
include but are not limited to approximately $74 million in
direct loans approved by Exim Bank in or around March 1992 (the
"1992 Loans") in order to finance irrigation and drainage
projects in eight Nigerian States.  The original 1992 loan
commitments were for Niger State (Eximbank Transaction No.
AP063872), Plateau State (No. AP064321), Adamawa State (No.
AP064322), Kaduna State (No. AP064323), Borno State (No.
AP064324), Bauchi State (No. AP064404), Kwara State (No.
AP064405), and Jigawa State (No. AP064406).

12.   The 1992 Loans and other Exim loans and loan
guarantees were fraudulently obtained through Exim Bank by MWI.
The loans were fraudulently obtained for several reasons,
including but not limited to MWI's knowing failure to disclose to
the relevant Nigerian Federal Government authorities the actual
commissions paid to MWI's sales agent in Nigeria, Alhaji M.
Indimi (and possibly others), in connection with the sales to the
various Nigerian States.  These commissions were well in excess
of the 2 percent limit imposed by Nigerian law and were often in
excess of 30 percent of the contract price of the goods to be
delivered.

13.   Portions of the commissions paid to Indimi were
used to fund further payments (in currency and/or goods) to
others in Nigeria, including certain Nigerian State governmental
authorities who had the power to influence the approval or
disapproval of MWI's sales to the Nigerian States and,
ultimately, the Nigerian Federal Government's applications to
Exim Bank for financing of those sales.

14.   The Nigerian Federal Government, in turn, relied
upon MWI's material misrepresentations and nondisclosures
regarding the commissions paid when it applied to Exim Bank for
financing.  The Nigerian Federal Government would not have
applied for the Exim Bank loans, and thus would not have made

claims for payment or approval upon the United States for the benefit of MWI, if it had known that MWI was acting in violation of Nigerian law with respect to its payments to its Nigerian sales agent and that MWI was further using those payments to influence Nigerian State Government authorities.

15.  In addition, most or all of the invoices submitted (or to be submitted) by MWI to Exim Bank for "drawdown" from the loan proceeds as on-board shipping documents are presented were (or are) fraudulent because the invoices falsely state that no "[c]ommissions and other charges of a like nature," either "included in or excluded from the [stated] selling prices," have been paid by MWI with respect to the goods and services reflected in each invoice.

16.  Furthermore, the "Certificate of Value," which is found on the reverse side of each invoice and is required to be signed by an authorized representative of MWI, states, inter alia, "[t]hat no arrangement or understanding affecting the purchase price of the said goods has been or will be made or entered into between the said exporter and purchaser or by anyone on behalf of either of them either by way of discount, rebate, compensation or in any manner whatever other than as fully shown on this invoice."

17.  MWI knew that the above representations reflected in the invoices were false when made, and MWI further intended that these knowing misrepresentations be relied upon by Exim Bank in releasing payments to MWI.

## MWI'S BACKGROUND

18.  MWI is a multinational corporation engaged in the manufacture, assembly, and distribution of pumping equipment and related items used primarily for irrigation, drainage, construction, and storm water projects.

19.  MWI was established in or around 1926, under the name M&W Iron Works, Inc., by the late Marlin Eller, the father of the current President and Chief Executive Officer, J. David Eller. In or around 1973, the company changed its name to M&W Pump Works, Inc.; in or around 1980, the company changed its name to M&W Pump Corporation; in or around 1995, the company changed its name first to Moving Waters Industries Corporation and then to its current name, MWI Corporation.  Since 1983, 100 percent of the capital stock of the company has been owned by the J. David Eller & Children Trust.

20.  MWI's primary manufacturing facilities, and its corporate headquarters, are located in Deerfield Beach, Florida.

11

21.  MWI also operates a manufacturing facility in Grant, Florida.  This facility operates under the name Couch Pump Company.

22.  In 1989, MWI established a small manufacturing and service facility in Maiduguri, Nigeria operating under the name M&W Pump Nigeria Ltd.

## MWI'S USE OF EXIM BANK FINANCING TO SUPPORT NIGERIAN SALES

23.  MWI's use of Exim Bank financing began in the early 1980s as J. David Eller, President and Chief Executive Officer of the company, became active in the Republican Party in Broward County, Florida.  Eller was a chairperson of the local Republican Party organization in Broward County and, during the Reagan and Bush years, was a delegate to the Republican National Convention. In addition, in or about 1989, Eller entered into a more formal contractual business relationship with a member of a prominent national political family in an apparent attempt to bolster MWI's sales abroad.

24.  During the 1980s, MWI began receiving increasing Exim loan support for its Nigerian sales.  Nigeria is an oil rich country generally known for its questionable business dealings. The Nigerian political and business environment combined with

MWI's overt political activism and influence created both sales opportunities in Nigeria and ready access to Exim Bank loan support for those sales back in the United States.

25.  Moreover, MWI never faced competition or bidding of any kind in securing the Nigerian sales contracts for which Exim Bank provided financing.  The fact that MWI was able to obtain Exim Bank financing at all is surprising given the Nigerian Federal Government's traditionally poor credit history.

STARTING THE CYCLE:  CREATING THE "NEED" IN NIGERIA

26.  Before MWI could obtain financing and thus payments from Exim Bank for its sales to Nigeria, MWI had to establish a "need" for its products in Nigeria so that Nigerian governmental authorities would approve the purchases and thus seek Exim Bank financing for the sales.

27.  MWI's Nigerian business began in the late 1970s and early 1980s when a high-ranking Nigerian governmental official, Abubakar H. Hashidu (who later became the Nigerian Minister of Water Resources) approached Alhaji Indimi regarding the potential for sales of irrigation and drainage-related pumping equipment to the various Nigerian State Governments, with such equipment ostensibly to be used for agricultural purposes.  Upon being

informed of this opportunity, Indimi approached MWI as a potential supplier of the equipment.

28.   In order to establish the need for MWI's products such that the Nigerian Federal Government would be induced to approach Exim Bank along with MWI in order to obtain financing, MWI began dispatching representatives to the various Nigerian States, and, with the imprimatur of the respective State Ministries of Agriculture and Natural Resources, MWI would generate reports and studies of the prevailing agricultural, topographical, and environmental conditions which would support the utility and public benefit of MWI's pumping equipment for irrigation and other agricultural and civic purposes.   In addition, each of the MWI reports and studies would specifically identify the types, sizes, and quantities of equipment "needed" to implement the project, including portable, engine-driven pumps, electric generators, submersible electric and hand-type well pumps, centrifugal pumps, sprinkler systems, computer equipment, vehicles, and other items.

29.   MWI's reports and studies would ultimately be submitted by the respective Nigerian States to the Nigerian Federal Ministry of Finance and Economic Development for approval.   Upon approval of the "need" for MWI's equipment by the Nigerian Federal Ministry, the Ministry, along with MWI, would then apply

to Exim Bank for financing of the sales.  Of course, MWI was not required to bid or otherwise compete with any other manufacturers to obtain any of its Exim-financed contracts from the Nigerian States.

30.  Through its access to cooperative Nigerian authorities -- which access was secured by payments (in currency and/or goods) to Nigerian State Government officials funneled through MWI's in-country agent Indimi -- MWI was able to successfully promote the exclusive "need" for its products.  In turn, MWI controlled access to Exim Bank credit.  In sum, MWI effectively controlled all aspects of the project, including what was to be furnished, how much it would cost, and how it was to be financed.

31.  Depite the Nigerian Federal Government's poor credit standing with the world community generally, and Exim Bank in particular, on the few occasions in the past 15 years when Exim Bank provided credit and financing to Nigeria for State-sponsored agricultural projects, such Exim Bank support was usually for the purchase of MWI products.

MWI'S NIGERIAN AGENT

32.  From the time when MWI's Nigerian business began in earnest in the early 1980s, MWI's sales operations and overall

15

interface with Nigerian governmental authorities have been
orchestrated by MWI's in-country Nigerian agent, Alhaji M.
Indimi.

33.   Indimi has well-established relationships with high-
ranking Nigerian State and Federal officials which have provided
MWI with the necessary access and opportunity to consummate Exim-
supported sales in Nigeria.

34.   Indimi is a principal of MWI's subsidiary in Nigeria,
M&W Pump Nigeria Ltd., and he has also been maintaining a
business address and residence in Boca Raton, Florida.

THE UNDISCLOSED COMMISSIONS

35.   Pursuant to Exim Bank rules and regulations, MWI was
required to execute Supplier's Certificates reflecting that MWI
has met all of the conditions and requirements of the loan
agreements with Exim Bank.  Among other things, the Supplier's
Certificates required disclosure of all payments made "in
connection with the sale of or the obtaining of any contract to
sell the goods and services covered by [MWI's] invoices or with
the establishment or operation of the Eximbank credit (including
any Preliminary Commitment relating thereto issued by Eximbank),"
except "[r]egular commissions or fees paid or to be paid [by MWI]

in the ordinary course of business to [MWI's] regular sales
agents or sales representatives and readily identifiable on
[MWI's] books and records as to amount, purpose and recipient."

36.   Despite the fact that MWI was paying commissions to its
sales agent Indimi in excess of 30 percent of the contract price
on many of these sales, a percentage which was in direct
violation of Nigerian law, MWI failed to disclose any such
commissions in its Supplier's Certificates submitted to Exim Bank
and signed by MWI's president and CEO, J. David Eller.

37.   MWI's Nigerian agent, Indimi, received a commission of
approximately 36.7% on the 1992 sales to the eight Nigerian
states, which were financed primarily by $74 million dollars in
direct loans from Exim Bank.   In addition, shortly after these
1992 sales, MWI shipped materials for a $15 million dollar
construction project consisting of a residence, a school, and
associated structures built on Indimi's property in Nigeria.

38.   During the relevant time period, MWI's actions as
described above were in violation of 12 C.F.R. § 401.3(c)
(although the Supplier's Certificate is still required of U.S.
suppliers by Exim Bank, this regulation was removed from the Code
of Federal Regulations on March 29, 1995, 60 Fed. Reg. 16,045),
which states, in pertinent part, that any person who has paid or

agreed to pay to another (other than regular full-time individual employees or staff members to the extent of their regular remuneration) a commission, fee or other compensation in connection with obtaining financial assistance from Exim Bank must include a certificate setting forth the name and address of the recipient of the commission, together with a description of the services rendered, and accompanied by the verification of the recipient or beneficiary of the agreement to pay named in the certificate.

39.  In addition, most or all of the invoices submitted by MWI ultimately to Exim Bank for "drawdown" from the loan proceeds as on-board shipping documents are presented falsely state that no "[c]ommissions and other charges of a like nature," either "included in or excluded from the [stated] selling prices," have been paid by MWI with respect to the goods and services reflected in each invoice.

40.  Furthermore, the "Certificate of Value," which is found on the reverse side of each invoice and is required to be signed by an authorized representative of MWI, states, inter alia, "[t]hat no arrangement or understanding affecting the purchase price of the said goods has been or will be made or entered into between the said exporter and purchaser or by anyone on behalf of either of them either by way of discount, rebate, compensation or

in any manner whatever other than as fully shown on this invoice"
and, further, "[t]hat this invoice is in all respects correct and
contains a true and full statement of the price actually paid or
to be paid for the said goods, and the actual quantity thereof."

41.   The form and content of the invoices submitted by MWI,
including the "Certificate of Value," is set forth under Nigerian
law and relied upon by Exim Bank in releasing payments from the
loan proceeds to MWI.

42.   MWI knew that the above representations reflected in
the invoices were false when made, and MWI further intended that
these knowing misrepresentations be relied upon by Exim Bank in
releasing payments to MWI.

43.   Portions of the commissions paid to Indimi were not
paid in currency, but were paid in the form of discounted loans
and other services as well as building materials and other goods
shipped to Nigeria by employees and/or other agents of MWI.

44.   Moreover, portions of the commissions paid to Indimi
were used to fund further payments (in currency and/or goods) to
others in Nigeria, including certain Nigerian State governmental
authorities who had the power to influence the approval or
disapproval of MWI's sales to the Nigerian States and,

ultimately, the Nigerian Federal Government's applications to Exim Bank for financing of those sales.

45.   These payments to Nigerian State officials thus provided the impetus to secure approval of MWI's sales to the States and, in turn, induce the Nigerian Federal Government to submit the loan applications to Exim Bank.  Without the payments, Nigerian Federal Government authorities would not have approved the projects and consequently sought financing from Exim Bank. Because the loans were thus fraudulently obtained from Exim Bank, all claims for payment by MWI to Exim Bank are false claims in violation of 31 U.S. § 3729(a)(1).

46.   Consequently, all payments made by Exim Bank to MWI on the basis of the fraudulent loan applications and invoices may be recovered by Plaintiff on behalf of the United States.

MWI'S DECEPTIVE EQUIPMENT DESCRIPTIONS

47.   In addition to the undisclosed commissions paid to its Nigerian agent (and further payments to others), MWI defrauded Exim Bank by developing deceptive equipment descriptions and pro forma invoices in order to avoid price comparisons by Exim Bank and/or the pre-shipment inspection company engaged by the Nigerian Federal Government.  While inspection guidelines, as set

forth by the Nigerian Federal Government, required that MWI's prices reasonably correspond with export prices for such goods generally prevailing in the country of supply (i.e., the United States), MWI would package assorted equipment into so-called "systems of pumps and related equipment", much of which was not manufactured by MWI, in order to prevent any meaningful price comparisons or verifications.  In this manner, MWI was able to obtain the "Clean Report of Findings" that it needed to complete each shipment.  This deceptive practice allowed MWI to charge exorbitant prices, often 200 to 500 percent higher than standard selling prices, on most or all of the equipment sold to the Nigerian States.

48.  Upon approval by the Nigerian-engaged inspection company of each of MWI's invoices and the consequent issuance of a Clean Report of Findings, the invoice would be forwarded to Exim Bank (often through a commercial intermediary) for payment and the equipment would be shipped to Nigeria.  Also of significance, the inspection guidelines, in conformity with Nigerian law, prohibited any "buying commission" in excess of 2% of the FOB (Free on Board) value of the shipment.  At no time did MWI inform Exim Bank of the commissions paid in connection with the sales of the equipment nor the fact that MWI was charging

prices to the Nigerians that were well in excess of the standard market prices.

49.  Much of the equipment sold to the Nigerian States by MWI has been held (or is being held) without clearing in Nigeria and, even upon clearance, is stored indefinitely and never utilized because the Nigerian States do not have either the need nor the distribution infrastructure to handle the equipment that is being sold.  Literally hundreds of pumps and major parts sold by MWI are rusting in the fields of the country.

## COUNT ONE

(False Claims Act)

50.   Plaintiff realleges and hereby incorporates by reference each and every allegation contained in Paragraphs 1 through 49 of this complaint.

51.   This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§3729-32, as amended, Pub.L. No. 99-562, 100 Stat. 3153 (1986).

52.   By virtue of the acts described above, DEFENDANT MWI CORPORATION has knowingly caused the submission and continues to cause the submission to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval under the direct loan and/or loan guarantee program of the Export-Import Bank of the United States.

53.   By virtue of the acts described above, DEFENDANT MWI CORPORATION knowingly made, used, or caused to be made or used, and continues to make or use or cause to be made or used, false records and statements to obtain Government payment of false or fraudulent claims.

54.   By virtue of the acts described above, DEFENDANT MWI CORPORATION conspired to defraud the Government by getting false and fraudulent claims allowed and paid.

55.   The United States Government, unaware of the falsity of the claims, records and/or statements made by DEFENDANT MWI

CORPORATION, and in reliance on the accuracy thereof, paid and continues to pay under the subject loans and/or loan guarantees relating to DEFENDANT MWI CORPORATION's contracts with the Nigerian States, which contracts provide payment by DEFENDANT MWI CORPORATION of commissions in excess of that permitted under Nigerian law.  Further, DEFENDANT MWI CORPORATION has expressly certified that, directly or indirectly, it has paid no such commissions.  The fraudulent conduct also potentially caused and will cause the Government to pay more under the loans and/or loan guarantees than it would have absent such conduct.

### PRAYER

WHEREFORE, Plaintiffs pray for judgment against DEFENDANT MWI CORPORATION as follows:

1.    That DEFENDANT MWI CORPORATION cease and desist from violating Title 31 U.S.C. §3729;

2.    That this Court enter judgment against the Defendant in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation of Title 31 U.S.C. §3729;

3.    That Plaintiff be awarded the maximum amount allowed pursuant to §3730 (d) of the False Claims Act;

4.    That Plaintiff be awarded all costs of this action, including attorneys' fees and court costs;

5.    That Plaintiff recover such other relief as the Court deems just and proper.

Plaintiff hereby demands trial by jury.

Dated: August 27, 1998

DECHERT PRICE & RHOADS

1775 Eye Street, N.W.
Washington, D.C. 20006-2401
Telephone: (202) 261-3300
Facsimile: (202) 261-3333

Catherine Botticelli (Bar No. 440877)

OF COUNSEL
Joseph J. Aronica (Bar   No. 446139)
Attorney for Plaintiff
On Behalf of the United
States of America

## Certificate of Service

Pursuant to 31 U.S.C. § 3730(b)(2) and Federal Rule of Civil Procedure 4(i), I hereby certify that, on this 27th day of August, 1998, a true and correct copy of the foregoing was served, via certified mail, return receipt requested, to the following:

Hon. Janet Reno
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Room B-103
Washington, D.C. 20530

Ms. Brenda Jones
Civil Process Clerk
United States Attorney
for the District of Columbia
555 4th Street, NW
10th Floor
Washington, DC 20001

_____
Joseph J. Aronica