# EXHIBIT (A)

COMPLAINT OF THE U.S.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
ex rel. Robert R. PURCELL,

    Plaintiffs,

5.

MWI CORPORATION,
and J. David ELLER,

    Defendants.

Civil No. 1:98CIV02088 (RMU)


RECEIVED 4-8-02 mail

## COMPLAINT OF THE UNITED STATES

The United States of America, on behalf of its agency, the Export Import Bank of the United States (EXIM), states as follows:

### Introduction

1. This is an action for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, the common law, and equity. In sum, the defendants failed to disclose to the EXIM commissions, other payments, and agreements to make payments in connection with their sale to the Federal Republic of Nigeria of irrigation and pumping equipment, which the EXIM financed. The Complaint demands monetary compensation and other relief for the United States.

### Jurisdiction and Venue

2. This Court has jurisdiction under 28 U.S.C. § 1345 and 31 U.S.C. § 3732.

3. This Court has venue under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the clams herein occurred in the District of Columbia; specifically, the

defendants made numerous misrepresentations and caused false claims and false statements to be submitted to the EXIM in the District of Columbia, and caused the United States to incur substantial damages in the District of Columbia.

## The Parties

4. The plaintiff is the United States, acting on behalf of the EXIM. The EXIM is an agency of the U.S. Government located in Washington, D.C. that helps to finance overseas sales of U.S. goods and services.

5. The relator is Robert Purcell, an individual residing in Briny Breezes, Florida. The relator was once Vice President of National Sales and then Director of Asian Operations at defendant MWI Corporation. The relator filed this action on August 27, 1998.

6. Defendant MWI Corporation (MWI) is a Florida corporation with its principal place of business in Deerfield Beach, Florida. MWI manufactures, assembles, sells and distributes pumping equipment and related items used primarily for irrigation and drainage.

7. Defendant J. David Eller is an individual residing in Deerfield Beach, Florida. From 1989 to 1994, Eller was President and owner of defendant MWI.

## Other Entities and Individuals

8. The Federal Republic of Nigeria (Nigeria) is a country located in West Africa, comprised of 36 States and a capital territory. Relevant to this action are the Nigerian States which are presently named Kano, Kaduna, Imo, Taraba, Anambra, Akwa Ibom, and Enugu (the seven Nigerian States).

9. Alhaji Mohammed Indimi is a citizen of Nigeria with his principal residence in Maiduguri, Nigeria. Indimi also owns homes in Palm Beach County, Florida.

10. Standard Chartered Bank (Standard Chartered) is a bank headquartered in London, England.

## Factual Allegations

### MWI's and Eller's Certifications

11. MWI sold irrigation pumps and other equipment to the seven Nigerian States (the MWI Sales to Nigeria).

12. To finance the MWI Sales to Nigeria, in 1992, the EXIM made eight loans to Nigeria totaling $74.3 million (the EXIM Loans). The loan numbers, dates, Nigerian States purchasing equipment, and amounts of each loan are enumerated on Attachment A to this Complaint.

13. Although the EXIM loans were issued to enable the respective Nigerian States to purchase the irrigation pumps and other equipment, Nigeria (acting through its Ministry of Finance and Economic Development) was the borrower, and responsible for repaying principal and interest on the loans.

14. Actual payments to MWI for the MWI Sales to Nigeria were made by Standard Chartered pursuant to eight letters of credit (Letter(s) of Credit). There was one Letter of Credit for each of the EXIM Loans. Under the Letters of Credit, upon MWI's presentation of certain documentation, Standard Chartered disbursed $74.3 million to MWI. The EXIM reimbursed Standard Chartered for all of these disbursements.

15. As a condition of the EXIM's agreement to repay Standard Chartered, *i.e.*, to issue a "reimbursement undertaking," the EXIM required MWI to execute "Supplier's Certificates." The Supplier's Certificates required MWI to disclose, with limited exceptions not applicable

- 3 -

here, any "commission, fee or other payment" agreed to or paid by MWI in connection with the MWI Sales to Nigeria. Specifically, MWI certified as follows:

> "We hereby further certify that we have not granted, paid or agreed to grant or pay any discount, allowance, rebate, commission, fee or other payment in connection with the sale or the obtaining of any contract to sell the goods and services covered by said invoices or with the establishment or operation of the Eximbank credit (including any Preliminary Commitment relating thereto issued by Eximbank), except:
>
> 1. Any discounts, allowances or rebates to the Buyer which are disclosed in said invoices;
>
> 2. Amounts payable to our regular full-time employees to the extent of their regular compensation;
>
> 3. Regular commissions or fees paid or to be paid in the ordinary course of business to our regular sales agents or sales representatives and readily identifiable on our books and records as to amount, purpose and recipient;
>
> 4. Other payments here listed."

16. To obtain the EXIM's approval of a reimbursement undertaking for each of the loans enumerated on Attachment A, MWI submitted a Supplier's Certificate.

17. With each request for payment under the Letters of Credit (*i.e.*, to "draw" upon the Letters of Credit in connection with the shipment of equipment), MWI was required to, and did, submit various documents, including an additional Supplier's Certificate. These Supplier's Certificates required the same disclosure and certification detailed above regarding any "commission, fee or other payment" agreed to or paid by MWI in connection with the MWI Sales to Nigeria.

18. MWI submitted forty-eight such Supplier's Certificates, one for each request for payment, along with other documents. The dates, corresponding loan number, signatory, and

invoice amount for each such Supplier's Certificate are detailed on Attachment B to this Complaint.

19. On each of the Supplier's Certificates, MWI certified that it had not "granted, paid or agreed to grant or pay" any commissions or other payments in connection with the MWI Sales to Nigeria, in the form detailed in paragraph 15 above.

20. MWI submitted the Supplier's Certificates detailed on Attachments A and B to Standard Chartered, which in turn submitted them to the EXIM. MWI knew that Standard Chartered would submit the Supplier's Certificates to the EXIM, and that the EXIM would rely upon them.

21. Eller signed forty-three of the forty-eight Supplier's Certificates detailed in Attachment B.

<u>Defendants Failed to Disclose Huge Commissions Paid to Indimi</u>

22. MWI paid Indimi approximately $28 million in commissions to obtain the MWI Sales to Nigeria (Indimi Commissions).

23. The Indimi Commissions were excessive and highly irregular as to MWI's own commission practices, as well as to normal and customary commissions, because they constituted 38% of the $74.3 million transaction total.

24. All of MWI's Supplier's Certificates were false, because they failed to disclose that MWI had agreed to pay, and did pay, the Indimi Commissions.

25. Eller, as President and owner of MWI, personally approved MWI's agreement to pay, and payment of the Indimi Commissions.

26. MWI and Eller had actual knowledge that, in failing to disclose the agreement to

pay and payment of the Indimi Commissions, the Supplier's Certificates were false. Alternatively, MWI and Eller acted in deliberate ignorance or reckless disregard of the truth or falsity of their certifications.

27.  Had the EXIM known that MWI had agreed to pay and/or did pay the Indimi Commissions in connection with the MWI Sales to Nigeria, it would not have issued reimbursement undertakings totaling $74.3 million and would have taken steps to prevent utilization of the Letters of Credit.

<u>Defendants Failed to Disclose Payments to Nigerian State Officials</u>

28.  Between November 1991, and May 1992, Indimi and other officers and employees of MWI traveled extensively throughout Nigeria.

29.  On several of these trips, Indimi and other officers and employees of MWI met with officials of the Nigerian States. The meetings took place at various locations in Nigeria, including State governors' palaces and business hotels.

30.  On these trips and at these meetings, Indimi possessed large quantities of Naira, the Nigerian currency, in amounts far in excess of what was needed to pay travel expenses.

31.  On one occasion, Indimi carried large quantities of Naira from the airport to the Abuja Hilton hotel, where he and other MWI officers and employees met with Nigerian State officials. Indimi and the other MWI officers and employees returned to the airport following the meeting without the currency.

32.  MWI officers and employees knew that Indimi was traveling with large quantities of cash, and believed that Indimi intended to and did use the cash to make payments to Nigerian State officials in connection with the MWI Sales to Nigeria.

33. The United States believes that there will be, after a reasonable opportunity for further investigation or discovery, evidence that Indimi made payments to Nigerian State officials in connection with the MWI Sales to Nigeria.

34. The United States believes that there will be, after a reasonable opportunity for further investigation or discovery, evidence that MWI officers and employees knew that Indimi made payments to Nigerian State officials in connection with the MWI Sales to Nigeria.

35. The Supplier's Certificates detailed on Attachments A and B were therefore false, also because they failed to disclose the agreement to pay, and the payments to, Nigerian State officials in connection with the MWI Sales to Nigeria.

36. MWI and Eller had actual knowledge that, in failing to disclose the agreement to pay and the payment to Nigerian State officials, the Supplier's Certificates were false. Alternatively, MWI and Eller acted in deliberate ignorance or reckless disregard of the truth or falsity of their certifications.

37. Had EXIM known of the agreement to pay or actual payments to Nigerian State officials in connection with MWI Sales to Nigeria, EXIM would either have refused to fund the transactions at all, or would have denied funding to the extent of the undisclosed payments.

MWI's and Eller's Attempts to Shield Assets from Creditors

38. Between 1985 and 1993, Eller or MWI owned Modern World Export Finance Corporation, which, in turn, owned airplanes used to conduct MWI business.

39. On one occasion, Eller flew from Florida to Nassau, Bahamas, in an airplane owned by Modern World Export Finance Corp. Eller brought on the flight a large duffel bag or suitcase filled with currency.

40.   Upon arriving in the Bahamas, Eller was met by a man in a chauffeured limousine. Eller took the duffel bag or suitcase of cash and left with this man. He returned several hours later, without the duffel bag or suitcase.

41.   Eller flew from Florida to Grand Cayman, in an airplane owned by Modern World Export Finance Corp. Eller brought on the flight another large suitcase filled with currency.

42.   Upon arriving at the airport on Grand Cayman, Eller was met by a man in a limousine. Eller took the suitcase of cash and left with this man. He returned several hours later, with the suitcase, which was then empty.

43.   On each occasion, Eller told MWI's Chief Pilot en route that Eller was moving his assets out of the United States.

44.   MWI and Eller's removal of assets hinders, delays, or defrauds the United States.

45.   The United States believes that there will be, after a reasonable opportunity for further investigation or discovery, evidence that MWI and Eller have taken other improper steps to shield, remove, or hide assets, which hinders, delays, or defrauds the United States.

<u>Count I: False or Fraudulent Claims</u>

<u>31 U.S.C. § 3729(a)(1)</u>

46.   Paragraphs 1 through 45 are realleged as though fully set forth herein.

47.   The defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(1), specifically, the Supplier's Certificates submitted to obtain the EXIM's approval of a reimbursement undertaking for each loan enumerated in Attachment A, and the Supplier's Certificates submitted along with each

request for payment enumerated in Attachment B.

48.     Because of the defendants' acts, the Government sustained damages in an amount to be determined at trial.

## Count II: False Statements
## 31 U.S.C. § 3729(a)(2)

49.     Paragraphs 1 through 45 are realleged as though fully set forth herein.

50.     The defendants knowingly made, used or caused to be made or used false records and statements to get false or fraudulent claims paid or approved by the Government, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(2), specifically, the Supplier's Certificates submitted to obtain the EXIM's approval of a reimbursement undertaking for each loan enumerated in Attachment A, and the Supplier's Certificates submitted along with each request for payment enumerated in Attachment B.

51.     Because of the defendants' acts, the Government sustained damages in an amount to be determined at trial.

## Count III: Unjust Enrichment

52.     The United States realleges and incorporates by reference paragraphs 1 through 45 of this Complaint, as though fully set forth herein.

53.     By reason of the foregoing conduct, defendants were unjustly enriched at the expense of the United States in an amount to be proven at trial, and in equity and good conscience, the money should be returned to the United States.

## Count IV: Payment by Mistake

54.     The United States realleges and incorporates by reference paragraphs 1 through 45

of this Complaint, as though fully set forth herein.

55.    By reason of the foregoing conduct of defendants, the United States made payments under mistake of fact.

56.    As a result of these payments by mistake, the United States has sustained substantial damages, in an amount to be proven at trial.

## CONCLUSION

57.    WHEREFORE, Plaintiff, the United States, demands judgment against Defendants jointly and severally as follows:

A.    Under Counts I and II (False Claims Act), a sum equal to three times the amount of damages the United States has sustained, including investigative costs, plus such civil penalties as are allowable by law; or

B.    Under Count II (Unjust Enrichment), a sum equal to the amount by which Defendants were unjustly enriched, plus interest and costs; or

C.    Under Count III (Payment by Mistake), a sum equal to the amount which the United States paid by mistake, plus interest and costs; and

D.    Such other relief as this Court may deem just and proper, including the imposition of a constructive trust over funds received in connection with the MWI Sales to Nigeria, together with interests and costs of this action.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

ROSCOE C. HOWARD, JR.
United States Attorney

*[signature]*

MARK E. NAGLE,
Assistant United States Attorney
(D.C. Bar # 416364)

*[signature]*

KEITH MORGAN
Assistant U. S. Attorney
(D.C. Bar No. 422665)

*[signature: Benjamin Vernia]*

MICHAEL F. HERTZ
STEPHEN D. ALTMAN
MICHAEL D. TAXAY
BENJAMIN J. VERNIA
(D.C. Bar No. 441287)
U.S. Department of Justice

Attorneys for Plaintiff
United States of America

April __, 2002.