## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| *ex rel.* ROBERT R. PURCELL, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:  98-2088 (RMU) |
| | : | |
| v. | : | Document Nos.:   234, 236, 241, 249, 255 |
| | : | |
| MWI CORPORATION, | : | |
| | : | |
| Defendant. | : | |

### MEMORANDUM OPINION

**GRANTING THE GOVERNMENT'S MOTION TO STRIKE THE DECLARATION OF JOHN STEPHEN FANCHER; GRANTING THE GOVERNMENT'S MOTION TO STRIKE THE DISCLOSURE AND DECLARATION OF JAMES MOORHOUSE; DENYING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT; DENYING THE DEFENDANT'S MOTION TO DISMISS THE RELATOR'S COMPLAINT**

## I.  INTRODUCTION

This matter concerns allegations that Moving Water Industries, Inc. ("MWI") defrauded the federal government by fraudulently concealing bribes made to its sales agents in Nigeria. One of MWI's former employees, Robert Purcell, originally brought this action under the False Claims Act.  The United States subsequently intervened to bring its own suit, alleging violations of the False Claims Act and other common law claims.  This matter now comes before the court upon a bevy of motions, including: the government's motions to strike two of the defendant's witnesses, the defendant's motion to dismiss Purcell's claims for lack of jurisdiction and the parties' cross-motions for summary judgment.

Because the defendant failed to disclose two of its witnesses during discovery, the court grants the government's motions to strike those witnesses' declarations.  Because the government has shown that the False Claim Act poses no jurisdictional bar to this matter, the

court denies the defendant's motion to dismiss Purcell's complaint.  Finally, because several genuine disputes of material fact exist with regards to the government's False Claims Act and common law claims, the court denies the parties' cross-motions for summary judgment.

## II.  BACKGROUND

### A.  Statutory Framework

The False Claims Act ("FCA") was signed into law by President Abraham Lincoln in 1863 to combat rampant fraud and war profiteering in Civil War defense contracts.  *Rainwater v. United States*, 356 U.S. 590, 592 (1958).  The FCA imposes civil penalties on any person who, among other things, knowingly submits false claims to the federal government.  31 U.S.C. § 3729.  The chief purpose of the FCA is to prevent the commission of fraud against the federal government and to provide for the restitution of money that was taken from the federal government by fraudulent means.  *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45 (1943).

A private person – referred to as the "relator" – may bring an FCA action in the name of the government.  *Id.* § 3730(b).  Under the FCA's *qui tam* provision, a relator may share in any proceeds that are ultimately recovered.[1]  *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 647 (D.C. Cir. 1994).  The FCA's *qui tam* provision brings legal force to the idea "that one of the least expensive and most effective means of preventing frauds upon the Treasury is to make the perpetrators of them liable to actions by private persons acting under the strong stimulus of personal ill will or the hope of gain."  *Hess*, 317 U.S. at 541, n.5 (internal citations

---

[1]  *Qui tam* is shorthand for "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," a Latin phrase which translates to "who pursues this action on our Lord the King's behalf as well as his own."  *Rockwell Intern. Corp. v. United States*, 49 U.S. 457, 463 n.2 (2007).

omitted).  In addition, the FCA's *qui tam* provision encourages whistleblowers to expose

fraudulent activities of which the government was previously unaware.  *Quinn*, 14 F.3d at 649;

*U.S. ex rel. Findley v. F.P.C.-Boron Employees' Club*, 105 F.3d 675, 678 (D.C. Cir. 1997).

Following the filing of a relator's FCA claim, the federal government may elect to

intervene in the case.  31 U.S.C. § 3730(b).  By intervening, the government bears the primary

responsibility of prosecuting the action and is not bound by the actions of the relator, who may

continue as a party to the original suit.  *Id.* § 3730(c).  If the government's intervening claim is

successful, the relator is then entitled to collect between 15% and 25% of the proceeds.  *Id.* §

3730(d).

## B.  Elements of an FCA Claim

The FCA provides for two types of liability.  *U.S. ex rel. Schwedt v. Planning Research

Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995).  First, the submitter of a "false claim" or "statement"

is liable for an automatic civil penalty, regardless of whether the submission of the claim actually

causes the government any damages.  *Id.*; 31 U.S.C. § 3729(a)(1)(G).

Second, the defendant may be held liable for damages that were actually sustained

because of the submission of the false claim.  *Id.*  The elements of a FCA action are that (1) the

defendant presented a claim to the government, (2) the claim was false and (3) the defendant

knew the claim was false.  *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F.

Supp. 2d 129, 134 (D.D.C. 2010).  FCA claims are also subject to a judicially imposed

materiality requirement.  *United States v. Science Applications*, 626 F.3d 1257, 1266 (D.C. Cir.

2010); *see also U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1169 (10th Cir.

2010); *U.S. ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 415 (3d Cir. 1999).

3

Finally, a plaintiff who successfully proves these four elements may recover damages only if it shows that the defendant caused the government to pay claims "because of" the alleged false statements. 31 U.S.C. § 3729(a). These damages are measured as the difference between what the government actually paid and what the government would have paid had it known of the falsity of the defendant's claim. *See U.S. ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 200 (D.C. Cir. 1995).

### B.  Factual and Procedural History

In the early 1990s, MWI, a Florida corporation, arranged to sell irrigation pumps and other equipment to seven Nigerian states. Govt.'s Statement of Undisputed Material Facts ("Govt.'s Stmt.") ¶¶ 1, 3. To finance these sales, MWI and Nigeria sought and received eight loans from the Export-Import Bank of the United States ("Ex-Im Bank"), an agency of the United States that is tasked with financing and facilitating the sales of U.S. exports to international buyers. *See* 12 U.S.C. § 635(a). These loans totaled $74.3 million. Govt.'s Stmt. ¶ 4.

Before the Ex-Im Bank would approve the loans, it required MWI to submit a "supplier's certificate" to the Ex-Im Bank attesting that it had not paid any "irregular commissions" or other payments in connection with the pump sales. *Id.* ¶¶ 15-16. Among other things, the supplier's certificates allow the Ex-Im Bank to finance U.S. exports while ensuring that sales are not tainted by the stigma of bribery or other illegal activity. Govt.'s Mot. for Summ. J., Ex. 10 at 7. After the Ex-Im approved the loan, MWI was required to submit another supplier's certificate to the Ex-Im Bank before any payment would be disbursed. Govt.'s Stmt. ¶ 17. Accordingly, MWI first submitted supplier's certificates to obtain the Ex-Im Bank's approval of the bank

reimbursements, and then submitted additional supplier's certificates prior to receiving each payment from the bank. *Id.* ¶¶ 16, 18. On each of the supplier's certificates, MWI certified that it had not paid any "irregular commissions" or made other payments in connection with the pump sales. *Id.* ¶¶ 19, 21.

The government alleges that these certifications were false. *Id.* ¶¶ 24, 35. Specifically, the government claims that MWI had paid $28 million in "excessive, highly irregular" commissions—namely, a series of bribes—to their Nigerian sales representative, Alhaji Mohammed Indimi ("Indimi"). *Id.* ¶¶ 22-27. The government contends these commissions represented 34 percent of the sales price of the pumps.[2] Govt.'s Mot. for Partial Summ. J. at 1.

At the time of this project, the government contends that MWI had a policy of paying its sales agents a commission of approximately 10 percent of the standard discounted sale price, plus half of any amount received over that price. Govt.'s Mot. for Partial Summ. J. at 7, Ex. 10 at 11-12. With the exception of Indimi's commission, MWI's commission payments between January 1, 1990 and December 31, 1994—a period encompassing the Indimi sales and 70 other MWI transactions—averaged $13,956 or 9 percent of the sale price. Govt.'s Mot. for Partial Summ. J. at 8.

---

[2]    The defendant contends that Indimi's compensation totaled no more than $26.2 million, reflecting aggregate commissions of 31.75%. Def.'s Mot. for Summ. J. at 3. This factual dispute is not central to the court's analysis.

Purcell is a Florida resident who was at all relevant times employed as MWI's Vice President of National Sales and Director of Asian Operations. Relator's Compl. ¶ 7. Purcell filed this action against MWI in August 1998, alleging that MWI violated the FCA. *See generally id.* Specifically, the relator's complaint alleges that MWI's receipt of $74.3 million in Ex-Im Bank loan guarantees was induced by MWI's fraudulent concealment of the fact that bribes were paid to Nigerian officials. *Id.* ¶¶ 11-13, 15-16, 23-31, 47-49. The relator's complaint charges MWI with violating the FCA by: (1) knowingly causing the submission of false or fraudulent claims for payment or approval; (2) knowingly making false records or statements to obtain government payment of false or fraudulent claims; and (3) conspiring to defraud the government. *Id.* ¶¶ 50-55. The relator seeks treble damages and civil penalties under the FCA. *Id.* ¶¶ 24-25.

The government intervened in April 2002 by filing suit against MWI and its former president and majority shareholder, J. David Eller. Govt.'s Compl. ¶¶ 11-45. The government's complaint contains not one but four counts. *Id.* ¶¶ 46-56. Of the four counts, the first two allege the same FCA violations as the relator's complaint, namely that MWI and Eller: (1) knowingly caused the presentation of false or fraudulent claims for payment or approval and (2) knowingly made false records and statements to obtain government payment of false or fraudulent claims. *Id.* ¶¶ 46-51. The third and fourth counts ("the common law claims") allege claims under the common law theories of (3) unjust enrichment and (4) payment by mistake. *Id.* ¶¶ 52-56.

Following the close of discovery, the parties filed cross-motions for summary judgment which were addressed by the court. *See generally* Mem. Op. (Nov. 6, 2007). Specifically, the court granted defendant Eller's motion for summary judgment on all claims, concluding that the

government's FCA claims against Eller were time-barred and that the government had failed to show that Eller derived any benefit from the government's actions. *Id.* at 12-21. In addition, the court granted in part the government's motion for partial summary judgment, concluding that the government had successfully presented two elements of its FCA claim.

Upon the court's order for supplemental briefing, the government and the defendant again filed cross-motions for summary judgment on the elements of (1) materiality, (2) falsity and (3) damages. *See generally* Govt.'s Mot. for Partial Summ. J.; Def.'s Mot. for Summ. J. Additionally, the defendant moves to dismiss the relator's claim for lack of jurisdiction, arguing that the "public disclosure" provision of the FCA deprives this court of jurisdiction. *See generally* Def.'s Mot. to Dismiss Against Purcell ("Def.'s Mot. to Dismiss"). Finally, the government filed two motions to strike under Rule 37(c)(1) various declarations submitted by the defendant. *See generally* Govt.'s Mot. to Strike the Declaration of John Stephen Fancher; Govt.'s Mot. to Strike the Disclose and Declaration of James A. Moorhouse; FED. R. CIV. P. 37(c). With this welter of motions now ripe for review, the court now turns to the parties' arguments and the relevant legal standards.

## III. ANALYSIS

### A. The Court Strikes Both the Declaration of John Stephen Fancher and the Disclosure and Declaration of James Moorhouse

In support of its motion for summary judgment, MWI submits the declarations of two witnesses: Stephen Fancher and James Moorhouse. *See* Def.'s Mot. for Summ. J., Ex. 6 ("Fancher Decl."); Def.'s Reply to Govt.'s Opp'n to Def.'s Mot for Summ. J., Ex. 3 ("Moorhouse Decl."). These submissions putatively shed light on the range of commissions that were common in the water pump industry. *See generally* Def.'s Opp'n to Govt.'s Mot. to Strike

7

Fancher Decl.; Def.'s Opp'n to Govt.'s Mot. to Strike Moorhouse Disclosure Decl.

The government argues that the declarations of Mr. Fancher and Mr. Moorehouse should be stricken from the record because the defendant failed to properly disclose both witnesses during discovery.  *See generally* Govt.'s Mot. to Strike Fancher Decl.; Govt.'s Mot. to Strike Moorhouse Disclosure & Decl.  The defendant counters that the declarations are admissible on account of legal arguments that were newly developed since the initial round of summary judgment briefing.  *See generally* Def.'s Opp'n to Govt.'s Mot. to Strike Fancher Declaration.  In addition, the defendants argue that these declarations inflict no harm on the government in the absence of a looming trial date.[3]  *See generally id.*; Def.'s Opp'n to Govt.'s Mot. to Strike Moorhouse Disclosure & Decl.

If "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."  FED. R. CIV. P. 37(c)(1).  As a corollary, the exclusion of evidence proffered in violation of Rule 26(a) is "automatic and mandatory unless the party to be sanctioned can show that its violation . . . was either justified or harmless."  *Foster v. United States*, 130 F. Supp. 2d 68, 70 n.1 (D.D.C. 2001) (quoting *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 785-86 (7th Cir. 2000)).

The defendant has failed to provide a substantial justification to support its untimely disclosure of the declarations.  The defendant has been on notice that it might be required to

---

[3]   The defendant also argues that the government's motion to strike violated Local Rule 7(m) because the government failed to contact the defendant before filing the motion.  Def.'s Opp'n to Govt.'s Mot. to Strike Fancher Declaration at 1-3.  Although violations of this rule may in some circumstances be grounds for denying a motion, the court has the discretion to excuse such failures.  *Ghawanmeh v. Islamic Saudi Academy*, 268 F.R.D. 108, 111 (D.D.C. 2011).  This is particularly true where, as here, the parties would have proceeded with the exact same disputes regardless of efforts to comply with the rule.  *Id.*

present evidence regarding the irregularity of the Indimi commission from the moment the government filed its complaint in 2002. *See* Govt. Compl. ¶ 23. The defendant's failure to anticipate the need for witnesses regarding this subject does not substantially justify the untimely submission of Mr. Moorehouse's and Mr. Fancher's declarations. *See Minebea Co. Ltd. v. Papst*, 231 F.R.D. 3, 6-7 (D.D.C. 2005) (determining that no substantial justification existed for untimely submission of testimony because the party "could reasonably have anticipated" the need for such testimony during discovery).

Likewise, the defendant has failed to demonstrate that the late disclosure is harmless. If the court accepted these eleventh-hour declarations, the government would effectively be deprived of the opportunity to depose the defendant's new witnesses. *See Elion v. Jackson*, 544 F. Supp. 2d 1, 6 (D.D.C. 2008) ("The harm from the failure to disclose a witness flows from the unfair surprise hindering the prejudiced party's ability to examine and contest that witness' evidence" (quoting *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc*., 493 F.3d 160 (D.C. Cir. 2007))). In addition, the government would be prevented from finding and deposing additional witnesses to rebut the new evidence if they so choose. *See id.* The defendant has thus failed to convince the court that the introduction of this new evidence, which would necessarily alter the government's trial preparation strategy, is harmless. *DAG Enterprises, Inc. v. ExxonMobil Corp*., 2007 WL 4294317, at *1 (D.D.C. 2007) (concluding that a party's access to data and knowledge of new witnesses prior to untimely submission is a significant factor in determining harmlessness). Accordingly, the court grants the government's two motions to strike.

**B.  The Court Denies the Defendant's Motion to Dismiss The Relator's Complaint**

The defendant also moves to dismiss the relator's complaint under Rule 12(b)(1) on the grounds that the FCA deprives the court of jurisdiction to entertain claims that are based on publicly available information.  *See generally* Def.'s Mot. to Dismiss.  According to the defendant, the relator's allegations were based on publicly available information at the time he filed suit.  *Id.* at 1.  They therefore contend that the FCA deprives the court of jurisdiction.  *Id.* at 1-2.  In response, the relator and the government deny that the allegations were based on publicly available information.  *See generally* Govt.'s Opp'n to Def.'s Mot. to Dismiss.  Resolution of this motion requires discussion of the jurisdictional bar and the relevant evidence before the court, which is provided below.

**1.  Legal Standard for a Motion to Dismiss Pursuant to Rule 12(b)(1)**

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art[icle] III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)).  On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject matter

jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

## 2. The FCA's Public Disclosure Bar

Courts lack jurisdiction to hear a relator's *qui tam* suit if the relevant information

underlying the suit has already entered the public domain through certain channels. *Graham*

*Cnty. Soil & Water Conservation District v. U.S. ex rel. Karen Wilson*, 130 S. Ct. 1396, 1401

(2010). In relevant part, the FCA states:

> No court shall have jurisdiction over an action under this section based upon the
> public disclosure of allegations or transactions in a criminal, civil, or
> administrative hearing, in a congressional, administrative, or Government
> Accounting report, hearing, audit, or investigation, or from the news media,
> unless the action is brought by the Attorney General or the person bringing the
> action is an original source of the information.[4]

31 U.S.C. § 3130(e)(4); *see also Quinn*, 14 F.3d at 651.

Congress's passage of the public disclosure bar aimed "to strike a balance between

encouraging private persons to root out fraud and stifling parasitic lawsuits," *Graham Cnty.*, 130

S. Ct. at 1407, especially "by those who learn of the fraud through public channels and seek

remuneration although they contributed nothing to the exposure of the fraud," *id.* at 1408 n.16

(internal quotations and citation omitted). This jurisdictional boundary represents Congress's

effort to achieve "the golden mean between adequate incentives for whistle-blowing insiders

with genuinely valuable information and discouragement of opportunistic plaintiffs who have no

significant information to contribute of their own." *Quinn*, 14 F.3d at 649. The plaintiff bears

---

[4]     On March 2010, the FCA's public disclosure bar was amended. *See* P.L. 111-149, § 10104(j)(2),
123 Stat. 1624. The newer version of the statute, however, does not apply to this action. *See
Graham Cnty. Soil & Water Conservation District*, 130 S. Ct. at 1400 n.1 (noting that the
amended version of the FCA does not apply retroactively). For convenience, the court uses the
present tense throughout this opinion to discuss the statute as it existed at the time that the relator
commenced this action.

the burden of establishing jurisdiction under the FCA.  *U.S. ex rel. Herbert v. Nat'l Acad. of Scis.*, 1992 WL 247587, at *4 (D.D.C. Sept. 15, 1992) (citing *Moir v. Greater Cleveland Regional Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990)), *aff'd*, 974 F.2d 192 (D.C. Cir. 1992).

Accordingly, the court must first determine whether the government and the relator have shown that the *qui tam* suit was not "based upon" allegations or transactions that were disclosed in the public domain.  *Quinn*, 14 F.3d at 654; *see also U.S. ex rel. Ronald Long v. SCS Business & Technical Institute*, 999 F. Supp. 78, 87 (D.D.C. 1998).  In doing so, the court must inquire as to "whether the publicly disclosed information could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing."  *U.S. ex rel. Earl S. Settlemire v. District of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999) (quotation marks omitted).  If the "publicly disclosed transaction is sufficient to raise the inference of fraud," the court lacks jurisdiction to hear the claim.  *Id.* at 919 (noting that the relevant public disclosures need not "irrefutably prove a case of fraud" but rather need only raise an inference of the alleged fraud).

Recognizing that "[c]ourts sometimes speak loosely of barring a *qui tam* suit because it is based on 'publicly disclosed information,'" the Circuit has explained that not all public information related to an allegation is sufficient to constitute "allegations or transactions" of fraudulent activity within the meaning of the FCA jurisdictional bar.  *Quinn*, 14 F.3d at 653 (explaining that "[m]any potentially valuable *qui tam* suits would be aborted prematurely by a reading of the jurisdictional provision that barred suits when the only publicly disclosed information was itself innocuous").  Instead, the FCA's public disclosure bar prohibits *qui tam* actions only when enough information exists in the public domain to expose the fraudulent

12

transaction in its entirety.  As the Circuit has explained, the term "'allegation' connotes a conclusory statement implying the existence of provable supporting facts," and "[t]he term 'transaction' suggests an exchange between two parties or things that reciprocally affect or influence one another."  *Id.*

The Circuit, in an effort to provide a more thorough explanation of the jurisdictional bar, fashioned the following equation:

> if X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements.  In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed. . . [W]hen X by itself is in the public domain, and its presence is essential but not sufficient to suggest fraud, the public fisc only suffers when the whistle-blower's suit is banned. When X and Y surface publicly, or when Z is broadcast, however, there is little need for qui tam actions, which would tend to be suits that the government presumably has chosen not to pursue or which might decrease the government's recovery in suits it has chosen to pursue.

*Id.* at 654.  In sum, the FCA's public disclosure bar prohibits *qui tam* actions "only when enough information exists in the public domain to expose the fraudulent transaction (the combination of X and Y) or the allegation of fraud (Z)."  *Id.*  Thus, even if one element of a fraudulent transaction is already in the public domain, "the *qui tam* plaintiff may mount a case by coming forward with either the additional elements necessary to state a case of fraud (e.g., Y) *or* allegations of fraud itself (e.g., Z)."  *Id.* at 655.

Finally, a court retains jurisdiction over a relator's complaint that is based on public information as long as the suit was filed by "an original source of the information."  31 U.S.C. § 3730(e)(4)(A).  An original source is statutorily defined as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is

13

based on the information." *Id.* § 3730(e)(4)(B).  The court, however, will inquire whether the

relator is an original source of the information if – and only if – the allegations were publicly

disclosed prior to the lawsuit.  *Quinn*, 14 F.3d at 651.

### 3.  Because the Relator's Suit Was Not Based on Publicly Available Information, the Court Retains Jurisdiction Over Purcell's Complaint

The defendant argues that Purcell's complaint lies outside the jurisdiction of this court

because "[t]he allegations forming the basis of [his] complaint were publicly disclosed" through

various news media articles and through Freedom of Information Act ("FOIA").  Def.'s Mot. to

Dismiss at 1.  In support of its motion to dismiss, the defendant references fourteen published

news articles, as well as documentary evidence that the government had received several FOIA

requests related to this action.[5]  *See generally id.*  According to the defendant, the relator "did not

provide any information to the Government until *after* the public disclosures had occurred, and

thus failed to contribute significant first-hand independent information not already in the public

domain." *Id.* at 1.

In response, Purcell argues that the news sources referenced by the defendant have no

bearing on the central allegations in this case and that "[n]either the fraudulent loan documents

nor the underlying allegations concerning [the defendant's] violations were publicly disclosed

prior to the filing of [this] *qui tam* action."  Relator's Opp'n to Def.'s Mot. to Dismiss at 4-5, 10.

Instead, Purcell asserts that he used his position within MWI to obtain "significant, independent

information" regarding "the fraudulent loan documents MWI submitted to Ex-Im Bank," and

---

[5]      The defendant does not provide the court with copies of the majority of news articles cited in its
brief.  *See generally* Def.'s Mot. to Dismiss.  For convenience, the court cites to the relevant news
articles by citing to the exhibits attached to Purcell's opposition of the defendant's motion.  *See
generally* Relator's Opp'n to Def.'s Mot. to Dismiss., Exs. B-P.  In addition, the defendant does
not provide any copies of relevant FOIA requests or responses to the court.

that he submitted this information to the government before commencing this suit. *Id*. at 7.

More specifically, Purcell states that he provided the government with "specific and substantial

information regarding the irregular and exorbitant commissions MWI paid to Mr. Indimi and

MWI's fraudulent disclosures to [the Ex-Im Bank] Bank regarding these commissions." *Id.* at

14.  Purcell further argues that although "certain information he gathered and submitted to the

government was obtained via a FOIA request to [the Ex-Im Bank]," he only received

"background documents and other general information." *Id.*  These arguments are addressed in

turn.

### i.  Public Disclosures Based on News Articles

MWI offers fourteen news articles in support of its argument that the allegations forming

the basis of Purcell's complaint had been publicly disclosed in the news media.  Def.'s Mot. to

Dismiss at 21.  Only seven of the fourteen news articles, however, were published prior to the

commencement of this action in August 1998.  *See generally id.*; Relator's Opp'n to Def.'s Mot.

to Dismiss, Exs. I-O.  As a matter of law, the articles that were published after Purcell's

complaint was filed have no relevance to the present jurisdictional inquiry.  *See* 31 U.S.C.

§3730(e)(4)(A).

The "critical elements" of Purcell's complaint center on MWI's pump sales to various

Nigerian states, which were financed by Ex-Im Bank loans and loan guarantees in the amount of

$74.3 million.  Relator's Compl. ¶ 11.  Purcell alleges that these Ex-Im Bank loans and loan

guarantees were fraudulently obtained when the defendant knowingly failed "to disclose to the

relevant Nigerian Federal Government authorities the actual commissions paid to Indimi (and

possibly others)." *Id.* ¶ 12.

15

The articles cited by the defendant instead concentrate on the business relationship that apparently existed between MWI's owner, David Eller, and Jeb Bush, the former governor of Florida and brother of former president George W. Bush.  *See generally id.*, Exs. J-N.  None of these articles contain any information regarding the critical elements underlying the relator's complaint.

One of the articles cited by the defendant, a May 1998 article in the Miami Herald, reports that MWI had generally conducted "fraudulent activities" in relation to its Nigeria sale, including "cash payments for influence and bid-rigging."  *See* Relator's Opp'n to Def.'s Mot. to Dismiss, Ex. L.  This article appears to merely summarize the allegations that were set forth in a previous lawsuit Purcell had filed against MWI, ostensibly making Purcell the original source of the information.  *Id.*; *see* 31 U.S.C. § 3730(e)(4)(A).  In any event, the article does not suggest that MWI concealed irregular sales commissions in an effort to secure loan money from the Ex-Im Bank, the central allegation at issue here.  Relator's Opp'n to Def.'s Mot. to Dismiss, Ex. L. Thus, the article does not provide the "critical elements" of the relator's complaint.

Because the articles that the defendant refers to in support of its motion do not discuss the critical elements of the allegedly fraudulent transaction at the core of this lawsuit, they do not trigger the FCA's jurisdictional bar.  *See, e.g.*, *U.S. ex rel. Mossey v. Pal-Tech, Inc.*, 231 F. Supp. 2d 94, 97 (D.D.C. 2002).

**ii.  Public Disclosures Based on FOIA Requests**

The defendant further argues that the FCA's jurisdictional public disclosure bar should apply because at least one major newspaper had filed FOIA requests to secure information regarding MWI's business activities in Nigeria.  Def.'s Mot. to Dismiss at 1.  The defendant is

correct to argue that a federal agency's written response to a FOIA request may constitute a "public disclosure" under the FCA's jurisdictional bar. *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S. Ct. 1885, 1889 (2011). That said, the substance of the defendant's argument is somewhat lackluster. The defendant cites to a news article that mentions the Wall Street Journal's FOIA request "for documents about the overseas business activities of [Jeb Bush]." Relator's Opp'n to Def.'s Mot. to Dismiss, Ex. J. However, the defendant provides no evidence as to what was requested (or what was eventually disclosed) as a result of the Wall Street Journal's FOIA request. *See generally* Def.'s Mot. to Dismiss. Because the defendant has not provided any evidence regarding this FOIA request, there is nothing before the court (aside from the defendant's *ipse dixit*) that shows that the factual allegations at the heart of this lawsuit had been publicly disclosed.

Finally, the defendant claims that Purcell simultaneously filed his own FOIA request for MWI and Ex-Im Bank documents related to the putatively fraudulent affairs that underlie this suit, and that the government subsequently responded to by releasing documents into the public domain by the summer of 1998. *Id.* at 5, 12. Again, the defendant provides the court with scant detail regarding the subject of the FOIA request or the government's response. *See generally id.* In response, Purcell claims that he received only "background documents and other general information" from the Ex-Im Bank. Purcell's Opp'n to Def.'s Mot. to Dismiss at 23-25. Although Purcell testified in his deposition that he received general "Ex-Im Bank records" via a FOIA request to the Ex-Im Bank, he insists that no documents relating to the allegations and transactions in the Complaint were released by the Ex-Im Bank in response to the FOIA request. *Id.*, Ex. A at 141. Purcell testified that he instead acquired the relevant suppliers' certificate from

17

another MWI employee.  *Id.*, Ex. A (Purcell Dep.) at 142-144.  The defendant fails to provide a

wisp of testimony or documentary evidence that might controvert Purcell's assertion.

      In sum, the FCA's public disclosure bar prohibits *qui tam* actions only when enough

information exists in the public domain to expose the fraudulent transaction.  *Quinn*, 14 F.3d at

653-54.  Here, the defendant has not put forth sufficient evidence to show that the allegation or

transaction underlying the present lawsuit was publicly available at the time that Purcell filed

suit.  Accordingly, the FCA's jurisdictional bar does not apply, and the court denies the

defendant's motion to dismiss the relator's complaint.

### 4.  The Court Denies Without Prejudice the Defendant's Motion for Summary Judgment on Attorney's Fees and Costs

      The defendant also moves to dismiss Purcell's claim for attorney's fees and costs.  *See*

Def.'s Mot. to Dismiss at 20.  The defendant contends that Purcell waived his claim to any

attorney's fees and costs by executing a settlement waiver and release from claims in a separate

lawsuit.  *Id.* at 20-21.  Purcell responds that the settlement only release MWI from claims that

were "related to [his] employment with MWI" and are thus unrelated to his current *qui tam*

action.  Relator's Opp'n to Def.'s Mot. to Dismiss at 31-32.

      A *qui tam* plaintiff is entitled to receive "reasonable expenses which the court finds to

have been necessarily incurred, plus reasonable attorneys' fees and costs.  All such expenses,

fees, and costs shall be awarded against the defendant."  31 U.S.C. § 3730(d)(1).  The FCA also

incorporates the attorney fees provision of the Equal Access to Justice Act, *see id.* § 3730(g),

which calls for attorney's fees to be awarded to a prevailing party in a suit brought by the

government unless the court finds that the government's position was "substantially justified or

that special circumstances make an award unjust."  28 U.S.C. § 2412(d).

The court declines the defendant's invitation to wade into this dispute before the ultimate issues of liability has been resolved.  It would be premature at this juncture for the court to determine whether the relator, the government or the defendant is the prevailing party in this suit. Once this matter is decided at trial, the parties may bring motions for attorney's fees and costs. At that later point in time the court may address whether the settlement waiver effectively prohibits the plaintiff from recovering attorney's fees and costs in this action.  *See U.S. ex rel. Sutton v. Double Day Office Servs.*, 121 F.3d 531, 535 (9th Cir. 1997) (denying without prejudice the relator's request for attorney's fees after determining that it was premature, as the case had not yet been resolved).  Accordingly, the court denies without prejudice the defendant's motion as it relates to attorney's fees and costs.

## C.  The Defendant Has Waived its Argument that the Complaint Lacks Particularity Under Rule 9(b)

The defendant contends that the government has not drafted its complaint with the specificity required by Rule 9(b) because it does not assert with sufficient precision whether the Indimi commission was "irregular."  Def.'s Mot. for Summ. J. at 9-13; FED. R. CIV. P. 9(b).  The government responds that this argument has been waived because it was not raised earlier in the litigation.  Govt.'s Opp'n to Def.'s Mot. to Dismiss at 11-12.

Federal Rule 9(b) requires that a pleader state with particularity the circumstances constituting fraud or mistake.  FED. R. CIV. P. 9(b).   If a party fails to raise a Rule 9(b) objection in the first responsive pleading or in an early motion, however, the issue will be deemed waived. *WMH Tool Group, Inc. v. Woodstock Intern., Inc.*, 2009 WL 6825247, at *10 n.4 (N.D. Ill. Dec. 09, 2009) (citing 2 JAMES WM. MOORE *et al.*, MOORE'S FEDERAL PRACTICE ¶ 9.03 [5] (2009)); *see also In re Docteroff*, 133 F.3d 210, 217 (3d Cir. 1997) (deeming Rule 9(b) challenge as

waived because the party did not raise the issue in a motion to dismiss or in his answer); *Jana, Inc. v. United States*, 41 Fed. Cl. 735 (Fed. Cl. 1998) (deeming Rule 9(b) objection waived in an FCA claim because it was not timely raised).  Here, the defendant has newly unveiled Rule 9(b) as a basis for dismissing the government's complaint after previously filing two dispositive motions that made no mention of this argument.  *See generally* Def.'s Mot. to Dismiss; Def.'s Mot. for Summ. J.

Even if this argument had not been procedurally waived, the defendant's argument is substantively meritless.  The Circuit has described the requirements set forth by Rule 9(b) as it applies to *qui tam* cases in *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002).  The court noted that a plaintiff may satisfy Rule 9(b) simply by setting forth the "time, place, and contents of the false representations."  *Id.* at 552 (citations and emphasis omitted).  Here, the defendant has been put on notice of these facts since day one.  *See* Relator's Compl ¶¶ 11-17 (describing time, place and contents of the Indimi commissions and the allegedly fraudulent supplier certificates).  The court therefore denies the defendant's motion to dismiss.

## D.  The Court Denies Both the Government's Motion for Partial Summary Judgment and the Defendant's Motion for Summary Judgment

### 1.  Legal Standard for Summary Judgment

Summary judgment is appropriate when the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine dispute" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment.  *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006).  Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."  *Greene*, 164 F.3d at 675.

### 2.  A Genuine Dispute of Material Fact Exists as to the "Falsity" Element of the Government's FCA Claim

The government argues that this court should conclude, as a matter of law, that the Indimi commission was not a "regular commission" within the meaning of the Ex-Im Bank's supplier's

certificates.  Govt.'s Mot. for Partial Summ. J. at 16-17.  The government contends that the undisputed evidence in the record shows that the Indimi commission was not consistent with normal commission practices in the defendant's industry.  *Id.*  In contrast, the defendant argues that the government cannot establish the element of falsity because it has failed to identify the "relevant industry framework" under which a commission would be deemed "regular."  Def.'s Mot. for Summ. J. at 4.  The defendant thus argues that the plaintiffs cannot define what the "geographic and product components at issue are in this specific case."  *Id.* at 6.  In the alternative, the defendant argues that a reasonable factfinder might conclude that the Indimi commission was "regular" and therefore did not constitute a false statement under the FCA.  Def.'s Opp'n to Govt.'s Mot. for Partial Summ. J. at 10-14.

Summary judgment is not generally appropriate if both parties have marshaled inconsistent facts to support their arguments as to whether or not a defendant's ran afoul of the FCA by violating applicable federal regulations.  *United States v. Sci. Applications Intern. Corp.*, 555 F. Supp. 2d 40, 53 (D.D.C. 2008) *aff'd in part and rev'd on other grounds*, 626 F.3d 1257 (D.C. Cir. 2010).  Rather, that is a task for a factfinder at trial.  *Id.* (citing *Chaple v. Johnson*, 453 F. Supp. 2d 63, 71 (D.D.C. 2006)); *see also U.S. ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 17 (D.D.C. 2008) (treating question of whether the defendant made a false statement under the FCA by failing to comply with federal regulations as a question for the jury; *United States v. Allen*, 116 Fed. App'x 210, 217 (10th Cir. 2004) (hearing appeal of jury determination as to whether or not a defendant's act was "false" under FCA).

Here, the government has put forth evidence to show that the average commission paid by the defendant was $13,956, or 9%.  Govt.'s Mot. for Partial Summ. J. at 19.  The government

contends that the uncontroverted evidence shows that the Indimi commission was $27,907,868, an amount that approximates 34% of the relevant project. *Id.* The government thus argues that the Indimi commission dwarfs the average commission paid by MWI in the relevant time period by a factor of 2,000. *Id.* at 20. The government also points out that the Indimi commission was almost four times greater than the average commission paid by MWI when measured by percentage. *Id.* The government also notes that the Indimi commission was 50 times larger than the second largest commission that had ever been paid by MWI in the relevant time period. *Id.* The government has buttressed its arguments by submitting documentary evidence of the defendant's prior history of paying commissions in the relevant time period. *Id.*, Ex. 11. In addition, the government has reinforced its arguments with the testimony of several of MWI's former employees. *See id.* at 9, Ex. 19 ¶ 6 (declaration of Robert Purcell); *id.*, Ex. 20 ¶ 5 (declaration of Juan Ponce).

The defendant responds that "[t]he question of what is 'regular' within the relevant industry is a question of fact that should be left to the jury, should this case proceed to trial." Def.'s Opp'n to Govt.'s Mot. at 10 n.4. The defendant contends that "the mere fact that a commission is greater than 2-15% does not, in a vacuum, make it irregular." *Id.* at 10. The defendant points to the declaration of a witness who contends that a 30% commission might be regular, depending on the level of effort the agent expended to obtain the business sought. *Id.* at 11; *id.*, Ex. A ¶¶ 8-10. Furthermore, the defendant argues that the government's evidence is inapposite, as its witnesses do not draw their experience from Nigeria in particular or West Africa generally. *See id.* at 12. Furthermore, the defendant relies on the deposition testimony of the government's witnesses to show that those witnesses lack both credibility and sufficient

knowledge with which to ground their conclusions.  *Id.* at 13-14.  Finally, the defendant points to evidence which may suggest that a 30% commission may have been issued in the past.  *Id.* at 14; *id.* Ex. F.

The government responds by attacking the relevance and applicability of the defendant's evidence and the defendant's alleged distortions of its proferred evidence.  *See generally* Govt.'s Reply in Support of Govt.'s Mot. for Partial Summ. J.  The court, however, is mindful that when ruling upon summary judgment, it may not resolve factual disputes or issue credibility determinations.  *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."); *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005) ("[A]t the summary judgment stage, a judge may not make credibility determinations, weigh the evidence, or draw inferences from the facts – these are jury functions, not those of a judge ruling on a motion for summary judgment.").  The court concludes at this juncture that a genuine dispute of material fact exists as to whether the defendant made a false statement when it certified that it had not paid any "irregular" commissions.[6]  Accordingly, the court denies both parties' motions for summary judgment on whether or not the defendant made a "false" claim when it failed to

---

[6]     The court also rejects the defendant's contention regarding the putative difficulty of defining the relevant industry.  The government suggests, quite reasonably, that the relevant industry may be defined roughly as those companies engaged "in the business of manufacturing and selling pumps and related equipment."  *See* Govt.'s Opp'n at 6.  Of course, the precise metes and bounds of the "relevant industry" cannot be defined with mechanical precision.  The court nevertheless has faith that a jury is more than capable of resolving any borderline definitional issues.  *See McCleskey v. Kemp*, 481 U.S. 279, 311 (1987) ("[I]t is the jury's function to make the difficult and uniquely human judgments that defy codification and that "buil[d] discretion, equity, and flexibility into a legal system." (citing H. KALVEN & H. ZEISEL, THE AMERICAN JURY 498 (1966))).  The defendant's argument – that the difficulty of defining the term "industry" insulates them from liability – is therefore meritless.

disclose the Indimi commission.

### 3.  A Genuine Dispute of Material Fact Exists Regarding the "Materiality" Element of the Government's FCA Claim

The parties disagree as to whether the defendant's failure to disclose the Indimi Commission was "material" within the meaning of the FCA.  Govt.'s Mot. for Partial Summ. J. at 22.  The government maintains that the FCA only requires a defendant's acts to be "material" inasmuch as they had "a natural tendency to influence agency action or were capable of influencing agency action."  *Id.* at 23.  In contrast, the defendant argues that the government cannot establish that its actions were material.  Def.'s Mot. for Summ. J. at 22.  The defendant construes "material" to require a showing that (1) the government actually relied upon the defendant's false statements; (2) the alleged false statement directly caused the government to approve the loans at issue; and (3) the alleged false statement proximately caused the government to approve the loans at issue.  Def.'s Opp'n to Govt.'s Mot. for Partial Summ. J. at 22.

Claims under the False Claims Act are subject to a judicially imposed materiality requirement.  *See, e.g.*, *Science Applications*, 626 F.3d at 1266; *U.S. ex rel. Lemmon v. Envirocare of Utah, Inc*., 614 F.3d 1163, 1169 (10th Cir. 2010); *U.S. ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 415 (3d Cir. 1999).  In particular, a defendant who falsely certifies that it has complied with an applicable federal regulation or contract may only be held liable if that false statement was "material" to the government's decision to disburse any funds.  *Science Applications*, 626 F.3d at 1269.  Here, the government claims that the defendant falsely certified that it had followed one of the Ex-Im Bank's internal regulations, which call for the disclosure of any irregular commissions.  *See* Govt.'s Mot. for Partial Summ. J. at 8-11.  The government must

therefore show that MWI's failure to disclose was material to the Ex-Im Bank's decision to pay the loans.

A false statement is "material" under the FCA if it has a natural tendency to influence agency action or is capable of influencing agency action.[7]   *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008); *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 914 (4th Cir. 2003); *M & T Morg. Corp.*, 519 F. Supp. 2d at 118; *see also Neder v. United States*, 527 U.S. 1, 22 n.5 (1999) (applying the same definition when judicially imposing a materiality requirement under federal fraud statutes). *United Westinghouse Savannah River Co.*, 352 F.3d at 917 ("Courts give effect to the FCA by holding a party liable if the false statement it makes in an attempt to obtain government funding has a natural tendency to influence or is capable of influencing the government's funding decision, not whether it actually influenced the government  . . . .").

A plaintiff must prove that the false statements were material by a preponderance of the evidence. *Science Applications*, 626 F.3d at 1271.  The plaintiff may do so by providing record evidence such as witness testimony to the effect that the government would not have awarded contracts had they known about certain payments.  *Id.*  Alternately, a plaintiff may establish materiality through testimony demonstrating that both parties to the contract understood that payment was conditional on compliance with the requirement at issue.  *Id.*

Here, the government has submitted evidence by which a reasonable juror could infer that the failure to report the Indimi commission was material.  *See* Govt.'s Mot. for Partial Summ. J.

---

[7]     It is not necessary to show – as the defendant contends – that the government actually relied on the false statements at issue.  Actual reliance may be relevant, however, with regard to damages.  *See infra* Part III.D.4.

at 23-25 (citing testimony from three Ex-Im Bank employees).  The defendant responds by characterizing the government's evidence as "speculative and unsupported by personal knowledge."  Def.'s Opp'n to Gov't.'s Mot. for Partial Summ. J. at 20.  In addition, the defendant points to the Ex-Im Bank employees' testimony to show that they lacked supervisory authority over approval of the Ex-Im Bank loans, arguing that remains unclear whether or not the defendant's disclosure of the Indimi commission would have realistically affected the witness' behavior.  Def.'s Mot. for Summ. J. at 24; Def.'s Opp'n to Gov't.'s Mot. for Partial Summ. J. at 20-28.  In sum, the parties dispute whether or not the government's evidence establishes the essentially factual question of whether or not the Indimi commission had the natural tendency of influencing agency action.  Although the court is not particularly swayed by the merit of the defendant's arguments, it is convinced that this matter is inappropriate for summary judgment. *M & T Morg. Corp.*, 519 F. Supp. 2d at 118 (declining to grant summary judgment because there were disputed issues of material fact regarding the materiality of the defendant's false statements).  The parties' cross-motions for summary judgment are therefore denied with regard to the element of materiality.

### 4.  A Genuine Dispute of Material Fact Exists Regarding the Element of Damages

The defendant argues that the government cannot establish that it suffered any damages under the FCA.  Def.'s Mot. for Summ. J. at 13-15.  The defendant contends that the government cannot show that (1) it relied upon the defendant's certificates before approving the loans at issue or that (2) identification of any irregular commissions would have been fatal to the defendant's loan application.[8] *Id.*  The government argues that the undisputed evidence shows that Ex-Im

---

[8]     The defendant also contends that the government has not suffered what it characterizes as "direct"

Bank officials actually relied on defendant's misconduct, and that those officials would not have approved of the loans had they known of MWI's fraudulent conduct. Govt.'s Opp'n to Def.'s Mot. for Summ. J. at 20-23.

To recover damages in an FCA claim, a plaintiff must prove that the defendant's false claims caused the government to decision to pay. *Id.* at 200; 31 U.S.C. § 3729(a). In proving causation, the government need only show that it relied on the defendant's false claim when making its decision to disburse the loans. *See Schwedt*, 59 F.3d at 200. The sum of recoverable damages is measured by the difference between what the government actually paid and what the government would have paid had it known of the falsity of the defendant's claim. *Id.* Here, if the government proves that Ex-Im Bank officials would not have issued the $74.3 million in loans had it known of the defendant's fraudulent actions, it is entitled to recover damages equal to the entire $74.3 million. *See id.*

In support of its claim, the government points to the testimony of several Ex-Im Bank employees, who stated that they never would have approved of the loans if they had known of the staggering scale of the Indimi commission. *See* Govt.'s Mot. for Partial Summ. J. at 23-25 (citing testimony from three Ex-Im Bank employees). In contrast, the defendant points to portions of that same testimony and suggests that government may have still approved the loans

---

damages because MWI eventually repaid Ex-Im Bank for the loans. Def.'s Opp'n to Govt.'s Mot. for Partial Summ. J. at 33. This is an incorrect statement of the law. With respect to damages under the FCA, the Supreme Court has held that the actual damages must first be multiplied pursuant to the statute, and then be reduced by any compensatory payments that are later received. *United States v. Bornstein*, 423 U.S. 303, 316-17 (1976); *U.S. ex rel. Miller v. Bill Harbert Intern. Const., Inc.*, 501 F. Supp. 2d 51, 54 (D.D.C. 2007). In addition, the plaintiffs may continue to seek statutory civil penalties under the FCA, which do not require any showing of causation. *M & T Mortg. Corp.*, 518 F. Supp. 2d at 122.

even if the defendant had reported the Indimi commissions.  Def.'s Opp'n to Govt.'s Mot. for Partial Summ. J. at 32.

Here, the parties dispute a relevant factual question – whether or not the evidence shows that Ex-Im Bank's employees would have approved the loans if they had known of the Indimi commission.  The extent to which a defendant caused damages in a FCA claim is usually a question for the jury.  *U.S. ex rel. Miller v. Bill Harbert Intern. Const., Inc.*, 2007 WL 851868, at *2 (D.D.C. March 14, 2007) ("The jury's job in this case will be to determine the number of violations and fix the amount of actual damages, if any.").  This is in part because the measure of damages necessarily turns on counterfactual scenarios – namely, the estimation of what would have occurred had the government known of the defendant's allegedly false statements.  This is a question that is best left to the province of the jury; after all, "the what-might-have-been is but boggy ground to build upon."  HERMAN MELVILLE, BILLY BUDD, SAILOR, AND OTHER STORIES 52 (Bantam Books 1962).  In sum, the court concludes that a genuine dispute of material fact also exists as to whether or not the government would have approved the Ex-Im Bank loans had it known of the Indimi commissions.  Accordingly, the court denies the parties' cross-motions for summary judgment on the element of damages.

### E.  The Court Denies the Government's Motion for Summary Judgment on Its Common Law Claims of Unjust Enrichment and Payment by Mistake

The government claims that it is entitled to summary judgment on its common law claims for the same reasons that it is entitled to summary judgment on its FCA claims.  Govt.'s Mot. for Partial Summ. J. at 34.  The government concedes one important point, however: if the court concludes that a material dispute of fact exists regarding the falsity of the defendant's acts, summary judgment on the government's common law claims would be inappropriate.  *Id.*  The

defendant argues that a material dispute of fact exists as to the falsity of its acts, thereby precluding the issuance of summary judgment on the government's common law claims.  Def.'s Opp'n to Govt.'s Mot. for Partial Summ. J. at 38.

The typical elements of a claim for unjust enrichment are that: "(1) the plaintiff conferred a benefit upon the defendant; (2) the defendant accepted and retained the benefit; and (3) it would be unjust for the defendant not to pay the plaintiff the value of the benefit."  *Rapaport v. U.S. Dep't of Treasury, Office of Thrift Supervision*, 59 F.3d 212, 217 (D.C. Cir. 1995).

In the context of this particular case, whether or not the defendant's acts were "unjust" turns entirely on the falsity of the defendant's acts.  Here, there exists a material dispute of fact as to whether or not MWI committed a false act.  *See* Part II.D.2, *supra*.  The court therefore concludes that this material dispute of fact precludes summary judgment on the government's unjust enrichment claim.  *See ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1113 (D.C. Cir 1988) (holding that the parties had alleged sufficient facts to preclude summary judgment on unjust enrichment claim); *Zirintusa v. Whitaker*, 274 F. Supp. 2d 1, 9 (D.D.C. 2009) (same). Accordingly, the court denies the government's motion for summary judgment on its unjust enrichment claim.

The government's motion for summary judgment under the common law theory of payment by mistake is so conclusory that it appears to be an afterthought.  *See* Govt.'s Mot. for Partial Summ. J. at 36.  Although the facts and legal arguments underlying this case have been briefed at great length, none of the many filings submitted here discuss the relevant facts as they pertain to the legal doctrine underpinning the government's payment by mistake claim. Accordingly, the court denies the government's motion for summary judgment on its fourth and

30

final claim.

## IV.  CONCLUSION

For the foregoing reasons, the court grants the government's motions to strike the declaration of John Stephen Fancher and James Moorhouse.  In addition, the court denies the defendant's motion to dismiss the relator's complaint.  Finally, the court denies parties' cross-motions for summary judgment.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 14th day of November, 2011.


RICARDO M. URBINA
United States District Judge