Case 1:98-cv-02088-GK   Document 328-1   Filed 04/25/13   Page 1 of 10

# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. Robert R. PURCELL,<br><br>                Plaintiffs,<br><br>v.<br><br>MWI CORPORATION and<br>J. DAVID ELLER,<br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil No. 1:98CIV02088 RMU<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF JAMES K. HESS**

1. My name is James K. Hess. Between March 8, 1992 and May 3, 2005, I was the Senior Vice President and Chief Financial Officer ("CFO") of the Export-Import Bank of the United States ("Eximbank"). Prior to that, I was Eximbank's Treasurer-Controller, holding that position from 1984 until 1992. I retired from Eximbank on May 3, 2005, after thirty-eight years as a Bank employee. The information provided in this affidavit is based on personal knowledge that I gained during my employment with the Eximbank.

2. As CFO of the Eximbank, I reported to the Chairman and President. I was responsible for all matters related to the Bank's financial records and activities. In connection with these responsibilities, I oversaw the proper receipt and disbursement of funds; billing and collection of loans receivable; recording and accounting of the Bank's assets, liabilities and equity; the accuracy and completeness of the Bank's financial records and reports; payment of claims under the Bank's export credit guarantee and insurance programs; and workouts and

restructurings of the Bank's credits if and when borrowers were unable to repay credits loaned or guaranteed by the Bank.

3.   In my capacity as CFO, I gained familiarity with the Eximbank's financing of the sale of industrial pumps by Moving Waters, Inc. ("MWI") to the Federal Republic of Nigeria ("Nigeria") in the early 1990s (MWI loans). The Eximbank made eight related loans totaling $74.3 million. The total amount paid by Nigeria to MWI for the pumps was $ 82.2 million.

4.   In my capacity as CFO, as well as my prior positions with the Eximbank, I also gained extensive familiarity with the Bank's mission. The Bank's mission is to provide direct loans, loan guarantees and insurance to support exports of U.S. goods and services in creditworthy transactions where the private sector is unwilling or unable to make the credit or where the U.S. exporter is facing officially supported foreign financing competition. The Bank does this in order to create and maintain U.S. jobs.

5.   In my capacity as CFO, as well as my prior positions with the Eximbank, I also gained extensive familiarity with the Eximbank's processes and internal controls for ensuring the fulfillment of its mission. The financing provided by the Eximbank in connection with the MWI loans consisted of direct loans made to Nigeria. During the time period relevant to the MWI loans, Eximbank's processing of direct loans involved three distinct steps: credit approval, credit documentation and credit disbursement.

6.   Credit Approval: Upon receipt of a properly completed application for financing from the Nigerian Ministry of Finance and MWI, the relevant Eximbank lending division made a recommendation to the appropriate approval authority with respect to the application. The amount, term and nature of the requested financing dictated whether the Board of Directors, Loan Committee or an individual Bank officer was the appropriate approval authority. The MWI loans received credit approval in 1992.

7.     Credit Documentation: Following approval of each credit, Eximbank and the borrower negotiated and executed a credit agreement. The credit agreement established, among other things, Eximbank's obligations to finance the sale of certain U.S. exports, the borrower's repayment obligation and the procedures for disbursing the credit. When the credit agreement was effective and the conditions precedent to disbursement were met, disbursements under the credit agreement began. In connection with the MWI loans, the Eximbank signed credit agreements with Nigeria in 1992 and 1993.

8.     Credit disbursement: Ex-Im Bank used two methods for disbursing funds under its direct loan program – the reimbursement method and the letter of credit method. The reimbursement method was used if the exporter had already shipped the exports and been paid by the borrower. The letter of credit method was used if the borrower had not yet paid the exporter. The MWI loan proceeds were disbursed using the letter of credit method.

9.     The letter of credit method involved the following steps:

- The borrower requested a commercial bank (the "L/C Bank") to issue one or more letter(s) of credit in favor of the U.S. exporter.

- The L/C Bank and Eximbank entered into an agreement (the "Bank Agency Agreement"), which established, among other things, the Eximbank's obligation to reimburse the L/C Bank for disbursements made under, and in accordance with, the terms of an Eximbank approved letter of credit.

- Prior to issuing the letter of credit, the L/C Bank must submit to Eximbank for approval (i) a fully completed request signed by the borrower for Eximbank to issue a "Reimbursement Undertaking" with respect to the letter of credit, (ii) a copy of each letter of credit the L/C Bank proposes to issue to the exporter and (iii) a fully completed "Supplier's Certificate (L/C Application)" (hereinafter

-3-

"Letter of Credit Supplier's Certificate") signed by the supplier and containing, among other things, a certification regarding commissions paid or to be paid. These documents are, collectively, referred to as the "L/C Documents." The delivery of the Letter of Credit Supplier's Certificate prior to approval of the letter of credit serves two important functions. First, it enabled the Eximbank to review the certificate in detail prior to issuing a commitment in connection with the transaction. Second, the Letter of Credit Supplier's Certificate became the documentary basis of comparison for the L/C Bank to evaluate future Supplier's Certificates presented by the U.S. exporter at the time of each disbursement (hereinafter "Disbursement Supplier's Certificates"). The L/C Bank would compare these future certificates with this Letter of Credit Supplier's Certificate and would only permit disbursements if such future certificates conformed to the original.

- The Eximbank's Contract Administration reviewed the L/C Documents, including the Letter of Credit Supplier's Certificate, and if these documents were in order, the Contract Administration would certify them and I would issue a Reimbursement Undertaking with respect to the letter of credit. The Reimbursement Undertaking is Eximbank's commitment to the L/C Bank to reimburse the L/C Bank for drawings made under the letter of credit.
- Once a Reimbursement Undertaking was issued to the L/C Bank, the U.S. exporter could begin to request disbursements under the letter(s) of credit. For each requested disbursement, the exporter had to present to the L/C Bank (i) an original, fully completed Disbursement Supplier's Certificate that conformed to the original Letter of Credit Supplier's Certificate delivered to Ex-Im Bank, (ii)

an invoice and (iii) a bill of lading. The L/C Bank examines these disbursement documents, and if they complied with the terms of the letter of credit and were otherwise proper, the L/C bank would pay the U.S. exporter.

- The L/C Bank then requested reimbursement from the Eximbank for the disbursement made to the U.S. exporter. The L/C Bank presented to the Eximbank a written request, which included the relevant disbursement documents provided to it by the U.S. exporter, including the completed Disbursement Supplier's Certificate.

- Contract Administration examined these documents and, if they passed inspection, would certify them. The documents would then come to the certifying officer in the Office of the CFO. Unless the certifying officer had any concerns with the documents, that officer would approve the Eximbank reimbursing the L/C Bank, and the disbursement would be prepared.

- The disbursement documents, together with the supporting documentation, would be sent to me or my designee, and unless my designee or I had any concerns with these documents, I or my designee would finalize the disbursement.

10. Both of the Eximbank's disbursement processes relied extensively on the integrity of the certifications made by the various parties, including the certifications made by the U.S. exporter on the Letter of Credit Supplier's Certificate and the Disbursement Supplier's Certificate. The Eximbank relied on the veracity of these certifications in connection with issuing the initial Reimbursement Undertaking for the benefit of the U.S. exporter, and both the L/C Bank and the Eximbank further relied on these certifications in approving subsequent disbursement requests – the L/C bank in making disubursements to the U.S. exporter, and the Eximbank in reimbursing the L/C bank for these payments to the U.S. exporter.

11. One of the critical certifications made by the U.S. exporter on both the Letter of Credit Supplier's Certificate and the Disbursement Supplier's Certificate relates to commissions paid or to be paid by the U.S. exporter. The U.S. exporter is required to certify on both forms that it has not paid, or agreed to pay, any commissions other than: "Regular commissions or fees paid or to be paid in the ordinary course of business to our regular sales agents or sales representatives and readily identifiable on our books and records as to amount, purpose and recipient."

12. A U.S. exporter's compliance with the commission certification contained on the Eximbank's Supplier's Certificates was critically important to fulfillment of the Eximbank's mission. The commission certification was designed to identify situations where the commission paid by a U.S. exporter were potentially suspect, such as where the commission exceeded what was normal and customary for similar transactions. Excess commissions were of significant concern to the Eximbank, and portended substantial harm to its programmatic objectives, for a number of reasons.

13. First, the Eximbank relies on market forces to set the appropriate price for the goods and services the Bank finances. This critical element of control is undermined by the payment of excess commissions. If an exporter pays an excessive commission, not only is the price of the good or service inflated by the excess commission, but it is also likely that market forces did not determine even the component of the price for the goods and services. Thus, where excess commissions are paid, it is likely that the price of the transaction financed by the Eximbank has been inflated by two factors – the excess commissions and the likely higher than market price for the goods and services themselves.

14. Second, the revenue generated by the goods and services financed by the Eximbank plays an important role in determining whether the borrower will have sufficient

revenues to repay the Eximbank's credit. If the price of the goods and services financed by the Eximbank is inflated by excess commissions and or non-market pricing, the revenue generated by those goods and services must be higher in order to repay the Eximbank credit than the revenue otherwise would have to be. This means, in turn, that the price charged by the borrower for the end products produced by the goods and services financed by the Eximbank must be higher, and thus the borrower will either less competitive than other producers of the same or similar products or, in the case of a government borrower, that the citizens may have to be taxed at a higher rate to service the credit, either of which puts the repayment of the credit at greater risk.

15.     Third, since the price of the financed goods and services are higher than they otherwise would have been, the importing country must devote more of its dollar foreign exchange to servicing the loan, thus reducing the amount of goods and services that could otherwise be imported for their citizens, thereby harming their economy.

16.     Fourth, the Eximbank has limited budget reserves to dedicate to approved loans and guarantees. The amount of the credit is an important factor in the amount of reserves that must be set aside for a particular credit. Excessive commissions and higher than market pricing means more budget reserve than necessary has to be set aside for that transaction, which can adversely impact the ability of the Eximbank to finance other export transactions. This, in turn, could require the Eximbank to deny financing for transactions involving other U.S. exporters, and the loss of U.S. jobs that those transactions would have generated.

17.     Fifth, excess commissions raise the risk of bribes or other illegal activity. The requirement that a U.S. exporter disclose excess commissions is a prophylactic that enables the Eximbank to ensure that transactions are complying with the requirements of the Foreign Corrupt Practices Act, and are otherwise free of any corrupting influences.

18. Finally, Eximbank is not simply in the business of commercial banking. Rather, Eximbank's objective is to finance the purchase of U.S. goods so as to create and maintain U.S. jobs. Thus, Eximbank's mission is not served when limited Eximbank funds are used to pay excessive commissions to foreign agents.

19. To address these concerns, as noted above, the Eximbank requires the exporter both before the Eximbank issues its reimbursement undertaking with respect to a letter of credit, and then subsequently in connection with each disbursement, to disclose any commission that is not a "regular commission." The Bank understood the term "regular commission" to refer to the level of commissions typically paid to agents in that industry. The Bank did not consider a commission to qualify as a "regular commission" just because the same amount was previously paid to the same agent, if that amount exceeded what was routinely paid to other agents. Such an interpretation of the term "regular commission" would not redress the Eximbank's concerns about excessive commission payments.

20. In connection with the MWI loans, MWI repeatedly certified that it paid only regular commissions, and did not disclose any commission payments on any of the Supplier's Certificates it completed. Based on these certifications, I or my designee presumed that MWI paid only regular commissions in connection with the MWI loans, and, in accordance with the procedures set forth in Paragraph 9, which were followed with respect to these loans, I or my designee issued Reimbursement Undertakings to a commercial bank, Standard Chartered Bank, authorizing eight letters of credit on behalf of MWI, and subsequently approved Standard Chartered's requests for reimbursement from the Eximbank of payments that it made to MWI. If MWI had not provided these certifications, or if any non-regular commissions disclosed by MWI had not been approved by Contract Administration, I or my designee would not have taken any of these actions.

21.     I understand that MWI has acknowledged that it agreed to pay a commission to a Nigerian agent in connection with the MWI loans of at least $28 million, which amounted to approximately 34% of the total contract price paid by Nigeria. Had I, as the Eximbank's senior official in charge of disbursing and accounting for the Eximbank's funds, been aware of the magnitude of this commission, I would not have issued and approved a Reimbursement Undertaking for these loans, authorizing letters of credit to be issued by Standard Chartered on behalf of MWI, nor would I have approved any subsequent disbursement of funds under any such letters of credit. I would have brought the matter to the attention of the Bank's General Counsel, and either the General Counsel or I would likely have consulted the Bank's Chairman.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Executed this the 26TH day of March, 2007.

_____
James K. Hess