UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| *ex rel.* ROBERT R. PURCELL, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 98-2088 (GK) |
| | : | |
| MWI CORPORATION, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

This matter comes before the Court for ruling after a jury trial. The jury found Defendant MWI Corporation ("Defendant" or "MWI") liable for violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1), (2).

The parties were ordered to submit supplemental briefs addressing the issue of damages. Plaintiff United States ("the Government") filed a Motion for Entry of Judgment ("U.S. Mot.") [Dkt. No. 458]. Defendant MWI Corporation ("Defendant" or "MWI") filed a Memorandum of Points and Authorities Regarding the Calculation of Damages ("MWI Mem.") [Dkt. No. 459]. Subsequently, the Government filed a Response to MWI's Memorandum ("U.S. Resp.") [Dkt. No. 463], Relator Robert R. Purcell ("Relator" or "Purcell") filed a Response to the Government and MWI's Calculation of Damages Regarding Entry of

Judgment ("Relator Resp.") [Dkt. No. 464], and MWI filed a Response to United States' Submissions ("MWI Resp.") [Dkt. No. 465]. After consideration of those submissions, the representations of the parties at the damages hearing held December 19, 2013, and the entire record herein, the Court will now address the issues raised and determine the amount of damages.

**A.   Factual Background**

In 1992, MWI, a Florida corporation, arranged to sell irrigation pumps and other equipment to seven Nigerian states. The total sale price was $82.2 million dollars.

To finance these sales, MWI and the Federal Republic of Nigeria ("Nigeria") sought and received eight loans from the Export-Import Bank of the United States ("Ex-Im"), an agency of the United States that finances and facilitates transactions between U.S. exporters and international buyers. Ex-Im agreed to finance the deal and loan Nigeria $74.3 million dollars. Nigeria would pay back the $74.3 million dollars, as well as interest and fees, and the individual Nigerian states would pay the remainder of the $82.2 million dollar price.

Before Ex-Im would approve the loans to Nigeria, it required MWI to submit a "Letter of Credit Supplier's Certificate" for each of the eight loans. On each of those eight

Letter of Credit Supplier's Certificates, MWI attested that it had only paid "regular commissions" in connection with the pump sales.

After Ex-Im approved the loans, but before it disbursed any funds, it required MWI to submit a "Disbursement Supplier's Certificate." MWI attested on fifty Disbursement Supplier's Certificates that it had paid only "regular commissions" in connection with the pump sales. Thus, MWI submitted eight Letter of Credit Supplier's Certificates and fifty Disbursement Supplier's Certificates to Ex-Im.[1]

In 1998, Relator Robert Purcell, a former employee of MWI, filed this action against MWI under the FCA [Dkt. No. 1]. He alleged that MWI paid commissions in excess of 30 percent of the contract prices for the irrigation pumps and equipment to its long-time Nigerian sales agent, Alhaji Mohammed Indimi. Id. ¶¶ 35-37. Purcell alleged that those commission payments were "irregular" and thus should have been disclosed on all of the Supplier's Certificates that MWI submitted to Ex-Im. Id.

---

[1] MWI argued for the first time in its Response that the Complaint identified only 48 Disbursement Supplier's Certificates and did not identify any Letter of Credit Supplier's Certificates. MWI Resp. at 10. At trial, MWI did not challenge the Government's evidence or testimony regarding 58 total Supplier's Certificates, and therefore the Court accepts these figures as correct.

In April of 2002, the United States decided to intervene, and filed a complaint which then governed the proceedings ("Complaint") [Dkt. No. 18]. Based in part on the amount of commissions paid to Indimi, which at the time was estimated to be approximately $28 million dollars,[2] the Complaint alleged two violations of the FCA (Counts I and II) and two common law claims for unjust enrichment and payment by mistake (Counts III and IV).

The case was litigated for several years before Judge Ricardo M. Urbina. After Judge Urbina's retirement, the case was reassigned to Judge Colleen Kollar-Kotelly, and then to this Court. After resolving many pre-trial motions, the case went to trial on November 6, 2013.

Counts I and II of the Complaint, the FCA violations, were to be decided by the jury. It was instructed that, if it found that MWI had violated the FCA, it was to identify the specific number of false claims and then "assess the amount of damages,

---

[2] At trial, the Government argued that MWI had paid $25 million dollars in commissions to Indimi, not $28 million. See, e.g., Pls. Opening St., Trial Tr. Nov. 8, 2013, A.M. Session at 25:9-12 (telling jury it needed "to decide whether MWI knew or should have known that the $25 million payment to Mr. Indimi was irregular and that it should have been disclosed"); Pls. Closing Arg., Trial Tr. Nov. 21, 2013, A.M. Session at 50:20-22 ("$25 million in Ex-Im funds went into the bank account of MWI's Nigerian agent Alhaji Indimi."); id. at 76:10-12 (suggesting that amount United States "unknowingly paid to Mr. Indimi," $25 million, be considered as measure of damages).

if any, that the [G]overnment sustained because of MWI's acts."
Closing Instructions, Trial Tr. Nov. 21, 2013 A.M. Session at
41:13:18 (quoting 31 U.S.C. § 3729(a)(1), which states that
defendant is liable for "3 times the amount of damages which the
Government sustains because of the act of that person").

In order to assess the appropriate amount of damages, the
jury was instructed, under United States v. Science Applications
Int'l Corp., 626 F.3d 1257, 1278-79 (D.C. Cir. 2010), that
damages were "the amount of money the government paid because of
the false claims over and above what it would have paid had MWI
not made the false claims," and that it would need to "set an
award that puts the [G]overnment in the same position as it
would have been in if the defendant's claims had not been
false." Closing Instructions, Trial Tr. Nov. 21, 2013 A.M.
Session at 41:19-24.[3]

On November 25, 2013, the jury returned a verdict for
Plaintiffs on both Counts I and II. The Government then
dismissed Counts III and IV of the Complaint, its common law
claims, with prejudice. Trial Tr. Nov. 25, 2013, A.M. Session at
22:18-20.

_____

[3] The Government did not object to the damages instructions. MWI
objected, arguing that the Court should instruct the jury that
the Government also had to prove proximate causation and actual
reliance. Closing Instructions, Trial Tr. Nov. 20, 2013, P.M.
Session at 121:22-25. It had no other objections to the
instruction. Id. 122:10-12.

**B.   Standard of Review**

Under the FCA, "if [the jury] finds liability, its instruction is to return a verdict for actual damages, for which the court alone then determines any multiplier, just as the court alone sets any separate penalty." Cook Cty., Ill. v. United States ex rel. Chandler, 538 U.S. 119, 132 (2003) (citing 31 U.S.C. § 3729(a)). Thus, it is now the Court's job to calculate the "civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of" MWI's actions. See 31 U.S.C. § 3729(a).

The "chief purpose of the (Act's civil penalties) was to provide for restitution to the government of money taken from it by fraud, and that the device of [treble] damages plus a specific sum was chosen to make sure that the government would be made completely whole." United States v. Bornstein, 423 U.S. 303, 314 (1976) (citing United States ex rel. Marcus v. Hess, 317 U.S. 537, 551-52 (1943)). In order to make the Government "whole," the Supreme Court has instructed that "the Government's actual damages are to be [trebled] before any subtractions are made for compensatory payments previously received by the Government from any source." Bornstein, 423 U.S. at 316.

## C.   Actual Damages

First, the jury found that MWI knowingly presented 58 false or fraudulent claims for payment to the Government, in violation of 31 U.S.C. § 3729(a)(1). Verdict Form, at 1 [Dkt. No. 453]. Second, it found that the amount of damages the Government sustained because of those claims was $7,500,000. Id.

The jury also found that MWI knowingly made 58 false records and/or false statements that were material to the Government's decision to pay or approve false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(2). Verdict Form, at 2. It found that the amount of damages the Government sustained because of those false records or statements was $7,500,000.

The Government concedes that the total amount of actual damages for both counts is $7,500,000. U.S. Mot. 3 at 1. The only party that disagrees is the Relator, who argues that the jury intended to award $7.5 million in damages for each count, for a total of $15 million. Relator Resp. at 2-3.

Relator's argument that the jury split the amount of damages between the two counts is nothing more than speculation. Relator ignores the important fact that the jury identified the same 58 Supplier's Certificates for both Counts. At trial, the Government argued that each of the 58 Supplier's Certificates

constituted a false claim and/or a false statement. Pls.'
Closing Arg., Trial Tr. Nov. 21, 2013, A.M. Session at 62:12-13
("MWI's certifications on the 58 Supplier's Certificates that it
submitted to Ex-Im were false."). Thus, it is clear that the
jury determined that the same conduct, the submission of the 58
Supplier's Certificates, was a violation of both Count I and
Count II. To aggregate the two sums would be to punish MWI twice
for the same conduct, which would "amount to a double recovery."
See Kakeh v. United Planning Org., Inc., 655 F. Supp. 2d 107,
122 (D.D.C. 2009) ("It is well-settled that a plaintiff is not
permitted to recover multiple awards for the same injury.")
(citing supporting cases).

The jury found that the 58 false certifications damaged the
Government by $7,500,000 and therefore that is the amount of
actual damages.

### D.  Treble Damages

An entity found liable for a violation of the FCA is liable
for "3 times the amount of damages which the Government sustains
because of the act of that person." 31 U.S.C. § 3729(a). The
parties agree that the first step in calculating treble damages
is to treble the actual damages amount. See Bornstein, 423 U.S.
at 316. Thus, the treble damages amount is $7,500,000 x 3 =
$22,500,000.

**E.    Offset for Compensatory Payments Under Bornstein**

The real – and difficult – issue in the calculation of total damages is whether, under Bornstein, MWI is entitled to an offset of the $108 million dollars that the Ex-Im eventually received from the federal Nigerian government as repayment of the loans at issue.

### 1.    United States v. Bornstein

Bornstein involved a Government contract for radio kits with a prime contractor, Model Engineering. 423 U.S. at 307. A subcontractor, United, knowingly sold Model Engineering electron tubes for inclusion in the radio kits that did not conform to the specifications of the Government contract. After the Government discovered the nonconforming electron tubes, Model Engineering paid the Government the difference in value between the radio kits as specified in the contract and the radio kits as supplied with the nonconforming electron tubes. Id.

Subsequently, the Government sued United under the FCA and prevailed. Id. at 308. A key issue before the Supreme Court was whether the amount of damages owed by United to the Government should be offset by the amount of Model Engineering's payments to the Government, or whether the amount of damages should be

doubled[4] before any subtractions should be made for Model Engineering's payments. Id. at 314. Significantly, the Government did not argue that Model Engineering's payments should not be deducted at all -- the question was when to deduct the payments. See id. at 314 n.9 (noting that Government had "abandoned" the position that "any compensatory payments it received should not be deducted from its statutory damages at all").

After evaluating the "language and purpose" of the FCA, the Supreme Court concluded that, "in computing the double damages authorized by the Act, the Government's actual damages are to be doubled before any subtractions are made for compensatory payments previously received by the Government from any source." Id. at 316-17.

### 2.   Issue Presented

It is undisputed that Nigeria eventually paid approximately $108 million to the Ex-Im on the loans at issue -- the $74.3 million dollar principal and $33.7 million dollars in interest and fees. MWI argues that, under Bornstein, the $108 million that Nigeria paid the Government should be considered

---

[4] The FCA was amended in 1986 and now provides for treble, not double, damages. See Cook Cty., Ill. v. United States ex rel. Chandler, 538 U.S. 119, 129-30 (2003) (discussing Congressional modernization of FCA in 1986, including raising the ceiling on damages from double to treble).

"compensatory payments previously received by the Government from any source" and subtracted from the amount of treble damages MWI owes the Government. Because the $108 million far exceeds the $22.5 million MWI owes the government as treble damages, MWI insists that, after applying the offset, it owes nothing to the Government in damages.

MWI also argues that an offset for these payments is mandatory under Bornstein and that the Court has no discretion about whether or not to apply it in this case. MWI Mem. at 2-4. That is incorrect. Bornstein did not define what constituted a "compensatory payment," nor did it address the argument raised by the Government in this case that certain compensatory payments need not be deducted from statutory damages. 423 U.S. at 314 n.9. Moreover, the Bornstein Court did not address a situation where the compensatory payments to be subtracted are larger than the single damages amount, much less, as in this case, entirely dwarf the treble damages amount.

Thus, there are several questions raised in this case that were neither raised nor addressed in Bornstein. MWI's argument that Bornstein resolves this issue without further analysis ignores the complexity of the issue.

-11-

### 3.   MWI's Alleged "Influence" of Nigeria's Repayment

The Government's first argument is that the Nigerian loan repayments were not "compensatory payments" because they were only made after MWI lobbied Nigeria to repay its loans at the expense of other loans due the Ex-Im. U.S. Mot. at 3-5. For the reasons set out below, the Court concludes that the Government failed to prove that MWI did in fact lobby the Nigerian government to repay the MWI loans after learning that its conduct was being investigated. Nor has the Government provided any evidence that Nigeria would have paid off other loans to the Ex-Im if it had not paid off the MWI loans.

The primary evidence the Government identifies in support of its argument is the deposition testimony of Steve Ahaneku, a Nigerian attorney. Ahaneku did not testify at trial, nor did the Government call him as a witness at the damages hearing. Instead, the Government relies on Ahaneku's deposition testimony that "someone at [MWI] talked to [him] about talking to the Nigerian officials specifically about repaying the EXIM loans that related to the Eight-State Projects." U.S. Mot. Ex. 2 at 3.[5]

Based on this deposition testimony, the Government argues that after MWI "became aware of a criminal investigation into

----

[5] Though the parties did not raise the issue, this testimony would likely have been inadmissible at trial as hearsay. Fed. R. Evid. 802.

-12-

their conduct," MWI paid Ahaneku "to convince Nigerian officials to pay off the MWI loan while other Exim loans were in default." U.S. Mot. at 3. The testimony clearly does not support this allegation.

The Government's assertion that Ahaneku was having these conversations "right around the time" that MWI discovered the investigation is incorrect. Ahaneku identified the time period when he was asked to speak to Nigerian officials about repaying the loans as between 1995, 1996, and 1997. Id. at 2. Although the parties dispute when MWI became aware of the investigation into its conduct, the Government does not suggest that MWI was aware of any investigation prior to December 1998. U.S. Resp. 7 n.3. That date is well after the period that Ahaneku was discussing in his deposition. Thus, Ahaneku's testimony about speaking to Nigerian officials in the mid-1990s does not support the Government's assertion about what MWI did after it became aware of the investigation in the late 1990s.

Second, Ahaneku's testimony does not support the Plaintiffs' argument that MWI lobbied Nigerian officials to pay off the MWI loans because MWI feared future liability. Instead, Ahaneku testified that MWI sought to discuss the loans with Nigerian officials because "officials come and go." Id. Ex. 2 at 2. Ahaneku noted that MWI was interested in assuring that the

-13-

loans were repaid because "it is an obligation, it's an outstanding obligation. The name is associated with it so they would like it to be tidied up." Id. at 3. The Government did not cite to any other portions of Ahaneku's deposition that impeach the credibility of this witness or his testimony, nor did it cite to any other testimony or evidence that contradicts the testimony.[6]

Consequently, the Government has failed to persuade the Court that Ahaneku's testimony stands for anything other than the fact that, before MWI knew about any investigation into its conduct, its agent spoke to Nigerian officials in an attempt to ensure that loans that involved MWI were repaid.

Other evidence marshaled by the Government also fails to supports its allegations. The Government notes the deposition testimony of James Hess, Ex-Im's Chief Financial Officer, who stated that Nigeria "singled out" the MWI loans for repayment. U.S. Mot. at 4, Ex. 3 at 1. However, Hess also testified that there was "nothing improper" about Nigeria choosing to make those payments, and that the Ex-Im would "rather have that money than not have it." Id. at 2.

The Government emphasizes that after MWI knew about this lawsuit, in 2002, it retained an American lawyer, Warren Glick,

---

[6] Naturally, there was an opportunity for cross-examination at the deposition.

to determine Nigeria's indebtedness on the MWI loans. U.S. Mot. at 4. The Government argues that MWI paid Glick to request information about the loans from the Ex-Im under the Freedom of Information Act ("FOIA"), and insinuates that MWI took that information and used it to influence Nigeria to repay the remaining balance. Id. at 4-5. Again, the evidence does not support the Government's chain of inferences.

The record shows that the vast majority of the loans were repaid well in advance of Glick's FOIA request.[7] Indeed, Ex-Im's response to Glick's FOIA request states that the remaining balance on the loans was approximately $270,000. U.S. Mot. Ex. 5 at 2. That constitutes less than 1% of the entire amount of the loans in question. In addition, the Government has presented no evidence that anyone from MWI interacted with Nigerian officials about the MWI loans after the FOIA request was made. Thus, the evidence cited by the Government simply does not support its allegations.

In addition, the Court notes that, even if the Government had identified evidence that MWI petitioned Nigeria to pay off

---

[7] Approximately 42% of the loans were repaid by December 1998, the earliest date the Government suggests MWI could have known about an investigation into its conduct. See Def. Exs. 321, 331, 364, 370, 382, 397, 416, 424. The loans were almost entirely paid off by May 3, 2001, over seven months before MWI received a copy of the Relator's Complaint and sent its FOIA request to the Ex-Im. See id.; see also U.S. Mot. Ex. 5 at 2 (Glick's FOIA request, dated January 16, 2002).

the MWI loans, such actions would not have been inappropriate. The Government cites no law, regulation, or case precluding MWI from lobbying Nigeria to take particular actions within Nigeria's discretion.[8] See MWI Mem. at Ex. 3 at 6 (Hess testimony that there was nothing "inappropriate or improper" about Nigeria choosing to repay the MWI loans). The Government fails to acknowledge the indisputable fact that Nigeria has the right to pay off its debts in whatever order it chooses.

The Government tries to avoid this fact by inferring that, had MWI not petitioned the Nigerian government to pay off the MWI loans, Nigeria would have applied those funds to other Ex-Im loans. Again, it provides no evidence to support that proposition. Thus, the Government's argument is pure speculation.

Since the Government has failed to provide a factual basis for its allegation that Nigeria repaid the loans in question at MWI's behest, or that Nigeria did so at the expense of other loans to the Ex-Im, the Court rejects the Government's argument that Nigeria's repayments were not "compensatory payments."

---

[8] Moreover, the evidence at trial showed that the Ex-Im actually required MWI to lobby Nigeria to repay other loans it owed to the Government as a prerequisite to granting the loans in this case. Test. of William Bucknam, Trial Tr. Nov. 8, 2013 P.M. Session at 51:7-53:2 (testifying that Ex-Im officials required MWI to collect unrelated arrearages from Nigeria in order to make credits operative).

-16-

### 4.   "Compensatory Payments"

The next issue that must be addressed is whether the
Nigerian loan repayments are "compensatory payments" under
Bornstein.[9] Neither the parties nor the Court have identified any
factually-comparable case under the False Claims Act that
provides helpful guidance on this issue. In the absence of
specific guidance, the Court looks to Bornstein and its progeny.

As noted above, the Government did not argue in Bornstein
that prime contractor Model Engineering's settlement payments to
the Government were not compensatory payments, nor did the
Government argue that compensatory payments should not offset

---

[9] MWI claims that the Government is judicially estopped from
arguing that the Nigerian repayments are not "compensatory." MWI
Resp. at 2-3. A court may invoke judicial estoppel "where a
party assumes a certain position in a legal proceeding, succeeds
in maintaining that position, and then, simply because his
interests have changed, assumes a contrary position." Moses v.
Howard Univ. Hosp., 606 F.3d 789, 798 (D.C. Cir. 2010) (internal
quotation marks and citations omitted). MWI points out that the
Government argued before trial that evidence of Nigerian
repayment should not be presented to the jury specifically
because the repayments were compensatory payments under
Bornstein. Id. (citing United States' Mot. Seeking
Reconsideration of the Court's Damages Rulings, at 4-5 [Dkt. No.
416]).

This Court did not adopt the Government's position that the
Nigerian repayments were "compensatory payments" that would
necessarily offset any damages. See Order on Mot. for
Reconsideration at 8 [Dkt. No. 425] (noting that if the jury
determined the Government suffered damages, "the Court will then
decide" whether MWI is entitled to a reduction based on
Nigeria's repayments) (emphasis added). Thus, the Government did
not "succeed" in maintaining its position, and judicial estoppel
is inapplicable.

the FCA liability of the subcontractor. The only question was when the payments should be used to offset liability -- before or after calculation of treble damages. See 423 U.S. at 314 n.9 (noting that Government "abandoned" the position that "any compensatory payments it received should not be deducted from its statutory damages at all").

The Supreme Court posited that the Government may have abandoned this position "for the reason that since United is liable to Model for Model's payment to the United States, United would in effect be assessed triple damages under such a rule." Id. Thus, the Court recognized the basic principle that, in a case involving joint tortfeasors, the liability to the Government is a shared liability that must be apportioned accordingly. See United States ex rel. Bunk v. Birkart Globistics, Nos. 1:02-cv-1168, 1:07-cv-1198, 2011 WL 5005313, at *16 (E.D. Va. Oct. 19, 2012) ("It is generally agreed that when a plaintiff settles with one of several joint tortfeasors, the non-settling defendants are entitled to a credit for that settlement.") (citation omitted); United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc., 501 F. Supp. 2d 51, 54-55 (D.D.C. 2007) (noting that "where there is a settlement between the plaintiff and one defendant, the liability of the remaining non-settling defendants must be calculated with reference to the

-18-

jury's allocation of the non-settling defendant's responsibility") (internal quotation marks and citation omitted).

That reasoning could be used to distinguish this case, because no evidence was presented nor argument made that Nigeria should be jointly or severally liable for MWI's false claims. See United States v. Hawley, 562 F. Supp. 2d 1017, 1025 (N.D. Iowa 2008) (noting that Bornstein does not stand for "the broad proposition that a defendant in a FCA case is entitled to a credit for any amounts recovered by the United States from another party," but instead "stands for the quite different proposition that a tortfeasor, such as a subcontractor, is entitled to a credit for compensation that the United States has recovered from another tortfeasor, such as a prime contractor"). However, the majority of post-Bornstein cases have not made this distinction.

Rather, the cases have applied the Supreme Court's statement in Bornstein that the offset encompasses "compensatory payments previously received from any source" literally. 423 U.S. at 316 (emphasis added). In particular, this issue has arisen in cases where individuals were found liable for fraudulently procuring federal loans, but the beneficiaries of those loans made payments on the underlying loans to the

-19-

Government. See United States v. Heck, No. 08-0875, 1987 WL 49253, at *6 (D.N.J. Mar. 26, 1987) (holding that defendant was entitled to offset including "amounts recovered from other parties"); United States v. Ekelman & Ass'n, Inc., 531 F.2d 545, 547 (6th Cir. 1976) (decided immediately after Bornstein and holding that offset should include "any amount recovered from the veteran-mortgagor by the government"); United States v. Globe Remodeling Co., 196 F. Supp. 652 (D. Vt. 1960) (finding, pre-Bornstein, that offset for "repayments to the government from the borrowers who defaulted" should be made "after doubling the original losses").

Evaluating this line of cases, the District Court for the District of Puerto Rico observed:

> Nothing in these cases holds or suggests that Bornstein's recoupment rule turns on the nature or source of the particular recoupment. Indeed, Bornstein itself forecloses such an interpretation. Bornstein twice emphasized that its holding applies to subsequent payments received from the government "from any source."

United States v. Irizarry-Colon, No. 05-1607, 2006 WL 6911517, at *11 (D.P.R. June 9, 2006) (quoting Bornstein, 423 U.S. at 316).

The Government has brought no case to the attention of this Court that holds that third-party payments on a loan that underlies FCA liability should not be considered "compensatory

-20-

payments." In the absence of any contrary precedent, this Court finds that Nigeria's repayments are "compensatory payments previously received from any source," and should thus offset MWI's liability.

### 5. Limitation on the Amount of Offset to "Original Loss"

The Government argues that, even if Nigeria's loan repayments are "compensatory payments" and should offset the amount MWI owes in damages, the Court should limit the amount of the offset to the "original loss" of $7.5 million dollars.

To justify its reasoning, the Government argues that the Court must segregate Nigeria's repayment into the "legitimate" amount repaid and the amount it repaid on "the fraudulent portion of the loan." U.S. Resp. at 2-3. It insists that to do otherwise would allow "doublecounting," because there are two separate obligations -- Nigeria's original obligation to repay the loans and MWI's new obligation to pay damages. Id.

The Government has identified no precedent from either the Supreme Court or our Court of Appeals that has applied such an analysis. Its argument rests on two cases in which district courts evaluated how to calculate a Bornstein offset when a Defendant had pleaded guilty and paid an amount in criminal restitution prior to a civil FCA suit. U.S. Resp. at 5-6

-21-

(discussing United States ex rel. Schaefer v. ContiMed Concepts,
No. 04-400, 2010 WL 1485660 (W.D. Ky. Apr. 12, 2010) ("Schaefer
II") and United States v. Eghbal, 475 F. Supp. 2d 1008 (C.D.
Cal. 2007)). These cases are factually distinguishable and do
not provide sufficient support for the Government's position.

Eghbal pleaded guilty to criminal charges of conspiring to
defraud the United States by fraudulently assisting purchasers
to obtain mortgages insured by the Department of Housing and
Urban Development in connection with the sale of 62 properties.
Eghbal, 475 F. Supp. 2d at 1011. He paid $1,346,220 in criminal
restitution based on those 62 properties. Amended Judgment and
Commitment Order, United States v. Eghbal, No. 03-cr-465 (C.D.
Cal. Jan. 27, 2004).

The Government then brought an FCA suit against Eghbal
based on 27 of the 62 properties. 475 F. Supp. 2d at 1011. The
Government sought damages of $2.8 million, trebled to $8.4
million, less $2.1 million it recovered on re-sale and "Eghbal's
restitution payments of $499,387." Id.

The Government argues that this case demonstrates that a
district court has discretion to apply only a portion of a
compensatory payment as an offset. The Court disagrees. The
parties in Eghbal did not dispute that the portion of the $1.3
million restitution payment that related to the 27 loans at

-22-

issue in the civil suit was $499,387. Id. This comports with the facts underlying the Government's civil suit -- the FCA suit only related to 27 of the 67 loans at issue in Eghbal's criminal proceeding. Thus, the district court was not choosing to apply a portion of Eghbal's compensatory payments -- the court was only applying the portion of Eghbal's restitution that was, in fact, compensatory, based on the scope of the FCA case.

Schaefer is similar. Defendant Conti pleaded guilty to one count of altering a prescription in 2007. See United States ex rel. Schaefer v. ContiMed Concepts, No. 04-400, 2009 WL 5104149, at *2 (W.D. Ky. Dec. 17, 2009) ("Schaefer I"). Conti then paid almost $80,000 in criminal restitution to the Center for Medicare Services and the State of Kentucky for various schemes and conspiracies to alter and falsify medical records, including the altered prescription underlying his criminal liability. Judgment and Commitment Order, United States v. Conti, No. 06-cr-152 (W.D. Ky. March 24, 2008); Order, United States v. Conti, No. 06-cr-152 (W.D. Ky. July 27, 2009).

The Government brought a civil FCA suit, and the District Court found that, based on the guilty plea, Conti was estopped from denying the elements of one claim of falsifying a prescription under 31 U.S.C. § 3729(a)(2). Schaefer I, 2009 WL 5104149, at *6. The court later found that the "actual damages

-23-

from that single count [were] $404.24." Schaefer II, 2010 WL 1485660, at *3. It trebled that amount, and found that Conti was liable for $1212.72, in addition to a civil penalty of $5,500, for a total of $6,712.72. Id.

Conti argued that the approximately $80,000 he had paid in criminal restitution should offset his entire civil judgment. Id. The Government argued that "only the compensatory portion of the judgment should be offset," id., and the Court agreed, subtracting only "the compensatory component, $404.24," from the civil judgment. Id. at *4.

Thus, the Schaefer and Eghbal courts found that only the portion of the criminal restitution payment related to the factual conduct underlying the false claim at issue in the subsequent FCA case should be offset under Bornstein. Because the excess amounts paid in criminal restitution were paid for unrelated conduct, the Court refused to apply those amounts as an offset.

Here, the Government argued, and the jury found, that Defendant was liable for its certifications on all 58 Supplier's Certificates related to the eight Nigerian loans. The Nigerian repayments were related to those same eight Nigerian loans. Thus, Schaefer and Eghbal do not provide guidance in a situation

-24-

such as this one, where the entire amount paid by Nigeria is unquestionably related to the underlying false claims.

The Government makes a public policy argument that allowing Nigeria's repayments to offset the entirety of MWI liability will "severely undermine Congress's intent to hold defendants accountable for defrauding the United States and deter others from engaging in similar misconduct." U.S. Resp. at 6 (citation omitted). However, neither the language of the statute nor any prior case provides support for this Court to divide Nigeria's repayments into compensatory and non-compensatory payments in light of the fact that the jury found liability for all of the loans in their entirety. Thus, in accord with the cases cited, this Court will subtract the full amount of the compensatory payments made by Nigeria from the trebled damage amount, as instructed in Bornstein. 423 U.S. at 316 (holding that "actual damages are to be doubled before any subtractions are made for compensatory payments previously received by the Government from any source") (emphasis added).

This result accords with the Supreme Court's declaration in Bornstein that "the device of [treble] damages plus a specific sum was chosen to make sure that the government would be made completely whole." Id. at 314. Despite the fraudulent actions taken by MWI to persuade the Government to make these loans,

-25-

they were in fact paid back in full with interest and fees. Indeed, the Government received a total of approximately $108 million on these loans from Nigeria -- $33.7 million more than the largest amount it pursued in damages, $74.3 million. That $33.7 million alone exceeds the $22.5 million in treble damages owed by MWI. Thus, the Government has been "made completely whole" because of Nigeria's repayments, and, thus, granting MWI an offset for those payments does not conflict with Bornstein.

The Court also notes that this outcome is in accord with United States ex rel. Davis v. Dist. of Columbia, 679 F.3d 832 (D.C. Cir. 2012). Davis sued the District of Columbia for submitting a Medicaid reimbursement claim without adequate supporting documentation. Id. at 834. Davis did not allege, however, that any medical services that the Government paid for were not provided. Id. at 840. Thus, because the only defect was documentary, the Court of Appeals upheld the district court's conclusion that "[t]he Government got what it paid for and there are no damages." Id. Although the factual and procedural posture of that case is very different, Davis still stands for the proposition that there are cases where fraud on the Government has occurred but, because the Government has gotten what it paid for, the Government's recovery is limited to civil penalties.

In short, the Court concludes that, in the absence of any contradictory precedent, the Court will apply the $108 million dollars repaid by Nigeria against the $22.5 million trebled damage amount. Thus, MWI owes nothing in damages.[10]

## F.   Civil Penalties

The Court now turns to the appropriate amount of statutory civil penalties which should be imposed.[11] The FCA establishes a statutory penalty of $5,000 to $10,000 for each false claim or false statement. 31 U.S.C. § 3729(a) (establishes that liable entity must pay "civil penalty of not less than $5,000 and not more than $10,000"). The jury identified 58 false claims.[12]

---

[10] If Congress agrees with the Government that this result is undesirable, it could change either the wording of the treble damage provision or increase the civil penalties, as it has done in the past. See, e.g., False Claims Amendments Act of 1986, Pub. L. 99-562, § 2(7), 100 Stat. 3153 (raising the civil fines and changing the multiplier for damages from double to treble).

[11] MWI did not argue that it was entitled to any offset against the amount it owes in statutory civil penalties.

[12] MWI initially agreed with Plaintiffs that the jury's determination that MWI made 58 false claims provided the appropriate number of penalties. However, in its Response, MWI argued for the first time that the Complaint did not identify the eight Letter of Credit Supplier's Certificates and only identified 48 Disbursement Supplier's Certificates, and now argues that 48 was the appropriate number of false claims for the Court to use in setting civil penalties. MWI Resp. at 10.

As noted above, see supra note 1, MWI did not challenge the Government's testimony or evidence at trial identifying 58 total Supplier's Certificates issued on the underlying loans at issue in this case. The jury found each of those documents to be a false claim and/or false statement. Thus, MWI's belated challenge to the jury's finding will be denied, and the Court

-27-

The parties agree that the appropriate range for the
statutory penalties is $5,000 to $10,000.[13] The determination of
the appropriate statutory civil penalty is firmly within the
discretion of the district court. <u>Bill Harbert</u>, 501 F. Supp. 2d
at 56 (citing <u>Cook County</u>, 538 U.S. at 132). The parties also
agree that the Court should consider the "totality of the
circumstances" in determining the appropriate amount of
penalties. U.S. Mot. at 7; MWI Mem. at 16. As the district court
observed in <u>Bill Harbert</u>:

> Though there is no defined set of criteria by which to
> assess the proper amount of civil penalties against
> the defendant, the Court finds that an approach
> considering the totality of the circumstances,
> including such factors as the seriousness of the
> misconduct, the scienter of the defendants, and the
> amount of damages suffered by the United States as a
> result of the misconduct is the most appropriate.

---

will set civil penalties based on the 58 false claims identified
by the jury.
[13] The Federal Civil Penalties Inflation Adjustment Act of 1990
("Adjustment Act"), Pub. L. No. 101-410, § 5, provides for
periodic increases to civil monetary penalties. In 1996, the
Omnibus Consolidated Rescissions and Appropriations Act of 1996
was passed, and it included the Debt Collection Improvement Act
of 1996 ("Improvement Act"). Pub. L. No. 104-134, § 31001. The
Improvement Act amended the Adjustment Act to require the head
of each agency to regularly adjust civil penalties for
inflation. <u>Id.</u> § 13001(s)(1)(A). In 1999, the Department of
Justice complied by issuing regulations raising such penalties,
including False Claims Act penalties. 64 Fed. Reg. 47,099,
47,903-04 (Aug. 30, 1999). However, the regulations specified
that the increase was only "effective for violations occurring
on or after September 29, 1999." <u>Id.</u> 47,903. The parties agree
that the conduct at issue here took place before that date, and,
thus, MWI is not subject to the increased penalties.

-28-

501 F. Supp. 2d at 56 (citation omitted). Under the totality of the circumstances, including consideration of the enumerated factors, the Court finds that the appropriate penalty is $10,000 per false claim for the following reasons.

First, the Court finds that the evidence regarding scienter weighs in favor of a high penalty in this case. Specifically, the Court finds that there was evidence that Mr. Eller, President of MWI, had actual knowledge that the commissions should have been disclosed. When repeatedly asked whether or not Indimi's commissions were disclosed on the Supplier's Certificates, Eller refused to answer directly. Instead, he kept repeating that MWI "would have never done anything wrong." Test. of David Eller, Trial Tr. Nov. 8, 2013, A.M. Session at 106:6-108:17; 111:10-112-1 (the Court asking Eller the question). He insisted he was "just an engineer," id. at 109:21, and claimed that he signed the Supplier's Certificates on the advice of his attorney, William Bucknam, or his Chief Financial Officer, Thomas Roegiers. Id. at 107:6-13; 109:10-21; 111:2-3; 113:12-14.

However, MWI employees testified that Eller personally approved every commission MWI paid, including Indimi's commissions. Test. of Thomas Roegiers, Trial Tr. Nov. 19, 2013, A.M. Session at 20:9-23; Test. of Juan Ponce, Trial Tr. Nov. 13, 2013, A.M Session at 9:22-10:8, 14:14-21. Moreover, Eller

-29-

testified that MWI never paid any other agent on any other combined project a total commission of more than $5 million, far less than some of the commissions Indimi was paid for single projects. Id. at 120:11-22. Thus, despite his protests that MWI would never engage in wrongdoing, Eller signed several Supplier's Certificates declaring that no irregular commissions had been paid even though he knew that Indimi's commissions were significantly higher than average commission rates, even within MWI.

Second, the evidence of actual knowledge suggests deliberate misconduct, which goes to the seriousness of the offense. Juan Ponce, MWI's Vice President of International Sales and a credible witness, testified, "we knew that we were violating . . . the rules. We just hoped that we would never get caught." Test. of Juan Ponce, Trial Tr. Nov. 13, 2013, A.M. Session at 35:3-4. This evidence that MWI deliberately withheld information about Indimi's commissions from Ex-Im in order to acquire financing supports a finding that "the conduct was deliberate and serious enough to weigh in favor of applying the maximum civil penalty." Bill Harbert, 501 F. Supp. 2d at 56.

Third, the Court considers the "amount of damages suffered" by the Government. The harm to the Government was more than monetary -- it went to the integrity and purposes of the Ex-Im's

programmatic goals. See Test. of Rita Rodriguez, Nov. 14, 2013,
A.M. Session at 20:1-7 (discussing Ex-Im's goals to support U.S.
jobs and to avoid any involvement with bribery). Given that
approximately a third of the total loan amount went to a single
Nigerian individual, the goal of the Ex-Im to finance loans that
primarily benefit U.S. exporters and workers was not achieved.
Test. of David Chavern, Trial Tr. Nov. 12, 2013, A.M. Session at
70:16-21 (noting that "purpose of the bank's financing is not
primarily . . . to finance commissions; it's to finance the
export of goods and services"); see also Ab-Tech Const., Inc. v.
United States, 31 Fed. Cl. 429, 434-35 (Fed Cl. 1994) (noting
that penalties are intended to "compensate the Government for
the costs of corruption," which include the "societal cost"
associated with abuse of a federal program) (internal quotation
marks and citation omitted).

    The Court also notes that the Government expended a massive
amount of resources to pursue this case over the years. In the
damages hearing, Government counsel represented that over 11,000
hours had been spent on the case. This consideration is relevant
to determining the appropriate civil penalty. See Morse Diesel
Int'l, Inc. v. United States, 79 Fed. Cl. 116, 125-26 (Fed. Cl.
2007) (considering that Government had "spent 13 years
investigating and prosecuting this case to date" in deciding

maximum civil penalties were warranted); <u>United States v. Peters</u>, 927 F. Supp. 363, 368-69 (D. Neb. 1996) (considering "the costs of detection, investigation and prosecution" as part of appropriate civil penalties); <u>Ab-Tech</u>, 31 Fed Cl. at 435 (determining that maximum civil penalty was "fully justified in light of the extensive diversion of resources" that uncovering defendant's fraud necessitated).

Considering the totality of the circumstances, the Court concludes that a civil penalty of $10,000 per false claim provides appropriate deterrence, reflects the seriousness of the misconduct and evidence of actual knowledge, and helps compensate the Government for the incredible amount of resources invested in identifying and litigating this lengthy case to successful conclusion.

### G.   Conclusion

The jury found that MWI violated the False Claims Act by making 58 false claims and that the Government suffered $7.5 million dollars in damages. Even after the damages are trebled, the amount that Nigeria repaid compensated the Government for its loss. MWI is responsible, however, for $580,000 in civil penalties.

An Order directing the Clerk to enter judgment accordingly shall accompany this Memorandum Opinion.


February 10, 2014                           Gladys Kessler
                                   United States District Judge


**Copies to**: attorneys on record via ECF