# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | : |
| *ex rel.* ROBERT R. PURCELL, | : |
|  | : |
| Plaintiffs, | : |
|  | : |
| v. | :    **Civil Action No. 98-2088 (GK)** |
|  | : |
| MWI CORPORATION, | : |
|  | : |
| Defendant. | : |

## MEMORANDUM OPINION

On November 25, 2013, after a nine-day trial, a jury found Defendant MWI Corporation ("Defendant" or "MWI") liable for violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1), (2). The matter is now before the Court on MWI's Motion for Judgment as a Matter of Law [Dkt. No. 443] and MWI's Renewed Motion for Judgment as a Matter of Law [Dkt. No. 478]. Upon consideration of the Motions, Oppositions, Replies, and the entire record herein, and for the reasons set forth below, the Court concludes that Defendant's Motion for Judgment as a Matter of Law shall be **denied** and Defendant's Renewed Motion for Judgment as a Matter of Law shall be **denied**.

## I.  **BACKGROUND[1]**

In 1992, MWI, a Florida corporation, arranged to sell irrigation pumps and other equipment to seven Nigerian states. The total sale price was $82.2 million.

To finance these sales, MWI and the Federal Republic of Nigeria ("Nigeria") sought and received eight loans from the Export-Import Bank of the United States ("Ex-Im"), an agency of the United States that finances and facilitates transactions between U.S. exporters and international buyers. Ex-Im agreed to finance the deal and loan Nigeria $74.3 million. Nigeria agreed to pay back the $74.3 million, as well as interest and fees, and the individual Nigerian states agreed to pay the remainder of the $82.2 million price.

Before Ex-Im would approve the loans to Nigeria, it required MWI to submit a "Letter of Credit Supplier's Certificate" for each of the eight loans. On each of those eight Letter of Credit Supplier's Certificates, MWI attested that it had paid only "regular commissions" in connection with the pump sales. See Pls.' Ex. 283.

---

[1] For purposes of ruling on a motion for judgment as a matter of law, the evidence is examined in the light most favorable to the nonmoving party. Kakeh v. United Planning Org., Inc., 655 F. Supp. 2d 107, 115 (D.D.C. 2009) (citation omitted). Accordingly, unless otherwise noted, the facts that follow are taken from the evidence presented at the nine-day trial held in November 2013 and from Plaintiffs' Oppositions.

After Ex-Im approved the loans, but before it disbursed any funds, it required MWI to submit a "Disbursement Supplier's Certificate." MWI attested on 50 Disbursement Supplier's Certificates that it had paid only "regular commissions" in connection with the pump sales. See Pls.' Ex. 284. Thus, MWI submitted eight Letter of Credit Supplier's Certificates and 50 Disbursement Supplier's Certificates to Ex-Im.[2]

In 1998, Relator Robert Purcell, a former employee of MWI, filed this action under the FCA. Complaint [Dkt. No. 1]. He alleged that MWI paid commissions in excess of 30 percent to its long-time Nigerian sales agent, Alhaji Mohammed Indimi ("Indimi"). Id. ¶¶ 35-37. Purcell alleged that those commission payments were not "regular" and should have been disclosed on all of the Supplier's Certificates that MWI submitted to Ex-Im. Id.

In April of 2002, the United States decided to intervene, and filed a complaint which then governed the proceedings ("Complaint") [Dkt. No. 18]. Based in part on the amount of commissions paid to Indimi, which at the time was estimated to

---

[2] As this Court has already noted, MWI did not challenge at trial the Government's evidence or testimony regarding 58 total Supplier's Certificates. United States ex rel. Purcell v. MWI Corp., _ F. Supp. 2d _, 2014 WL 521524, at *1 n.1 (D.D.C. Feb. 10, 2014) ("Judgment Opinion").

-3-

be approximately $28 million dollars,[3] the Complaint alleged two violations of the FCA (Counts I and II) and two common law claims for unjust enrichment and payment by mistake (Counts III and IV).

The case was litigated for several years before Judge Ricardo M. Urbina. Judge Urbina made several findings and conclusions that bind this Court, including two opinions granting in part and denying in part various Motions for Summary Judgment. See United States ex rel. Purcell v. MWI Corp., et al., 520 F. Supp. 2d 158 (D.D.C. 2007) ("First MSJ Opinion"); United States ex rel. Purcell v. MWI Corp., 824 F. Supp. 2d 12 (D.D.C. 2011) ("Second MSJ Opinion").

After Judge Urbina's retirement, the case was reassigned to Judge Colleen Kollar-Kotelly, and then to this Court. After resolving many pre-trial motions, the case went to trial on November 6, 2013.

_____

[3] At trial, the Government argued that MWI had paid $25 million dollars in commissions to Indimi, not $28 million. See, e.g., Pls.' Opening St., Trial Tr. Nov. 8, 2013, A.M. Session at 25:9-12 (telling jury it needed "to decide whether MWI knew or should have known that the $25 million payment to Mr. Indimi was irregular and that it should have been disclosed"); Pls.' Closing Arg., Trial Tr. Nov. 21, 2013, A.M. Session at 50:20-22 ("$25 million in Ex-Im funds went into the bank account of MWI's Nigerian agent Alhaji Indimi."); id. at 76:10-12 (suggesting that measure of amounts be the $25 million that United States "unknowingly paid to Mr. Indimi").

-4-

At the close of the Government's case, MWI moved for judgment as a matter of law under Rule 50(a). Trial Tr. Nov. 19, 2013, P.M. Session at 79:8-80:7. "Consistent with the best practices governing pre-verdict motions, the Court reserved ruling" on MWI's motion. See Hancock v. Washington Hosp. Ctr., _ F. Supp. 2d _ , 2014 WL 60288, at *1 (D.D.C. 2014) (quoting Moore's Federal Practice Civil § 50.33). The Court ordered Defendant to file a written brief in support of its motion. Trial Tr. Nov. 19, 2013, P.M. Session at 80:7-8.

On November 22, 2013, the case went to the jury on Counts I and II of the Complaint. On November 25, 2013, the jury returned a verdict for Plaintiffs on both Counts I and II [Dkt. No. 453]. The Government then dismissed Counts III and IV of the Complaint, its common law claims, with prejudice. Trial Tr. Nov. 25, 2013, A.M. Session at 22:18-20.

On December 9, 2013, Plaintiffs filed an Opposition to Defendant's Motion for Judgment as a Matter of Law [Dkt. No. 460], and on December 19, 2013, Defendant filed a Reply [Dkt. No. 466].

On February 12, 2014, Judgment was entered in favor of Plaintiffs [Dkt. No. 473]. On March 12, 2014, MWI filed a Renewed Motion for Judgment as a Matter of Law ("Renewed Mot.") [Dkt. No. 478]. On April 9, 2014, Plaintiffs filed an Opposition

-5-

[Dkt. No. 483], and on April 25, 2014, Defendant filed a Reply ("Renewed Reply") [Dkt. No. 484].

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 50(a), "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," then a court may "grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1)(B).

"If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). If the moving party renews its motion for judgment as a matter of law following the discharge of the jury, the Court may consider the motion and, if appropriate, direct the entry of judgment as a matter of law. Fed. R. Civ. P. 50(b)(3).

"The legal standard for granting a motion for judgment as a matter of law is the same whether it is rendered during the

-6-

trial under Rule 50(a), or after the jury has been discharged under Rule 50(b)." Beyene v. Hilton Hotels Corp., 958 F. Supp. 2d 247, 249 (D.D.C. 2013). A court should grant judgment as a matter of law only "when a party has been fully heard on an issue, and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000).

Although the court should examine all evidence in the record, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Id. at 149. Moreover, courts "do not . . . lightly disturb a jury verdict. Judgment as a matter of law is appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor." Nelson v. Dist. of Columbia, 953 F. Supp. 2d 128, 130 (D.D.C. 2013).

As a post-trial Rule 50(b) motion is limited to a renewal of a Rule 50(a) motion for judgment as a matter of law, the post-trial motion must be limited to those grounds that were specifically raised in the prior Rule 50(a) motion. Beyene, 958 F. Supp. 2d at 249 (citation omitted).

## III. ANALYSIS

The Government alleged two violations of the FCA. First, the Government alleged that MWI knowingly presented false or fraudulent claims for payment to the United States Government. Complaint ¶¶ 46-48 (citing 31 U.S.C. § 3729(a)(1)). Second, the Government alleged that MWI knowingly made false records or false statements to get the Government to pay or approve false or fraudulent claims for payment. Complaint ¶¶ 49-51 (citing 31 U.S.C. § 3729(a)(2)).[4] The jury found for the Government on both Counts. Verdict at 1-2 [Dkt. No. 453].

---

[4] On May 20, 2009, Congress enacted the Fraud Enforcement and Recovery Act of 2009 ("FERA"). Among other things, Congress replaced the language of Section 3729(a)(2) with a new section 3729(a)(1)(B). See FERA, Pub. L. No. 111-21, § 4(a)(1), 123 Stat. 1617 (May 20, 2009). The amendments were made retroactive to all "claims" under the False Claims Act "that are pending on or after" June ·7, 2008. Id. § 4(f). Although our Court of Appeals has not yet decided this issue, United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1266 (D.C. Cir. 2010), (assuming without deciding that lower court determination that statute did not apply retroactively was correct), the district courts in this Circuit have found that the retroactivity presumption applies to claims, but not cases, pending in June 2008. See, e.g., United States ex rel. Barko v. Halliburton Co., 952 F. Supp. 2d 108, 118 (D.D.C. 2013) ("The retroactive provisions apply, then, to fraudulent requests for money pending on or after that date."); United States v. First Choice Armor & Equip., Inc., 808 F. Supp. 2d 68, 76-77 (D.D.C. 2011) ("The word 'claims,' as it applies in the relevant provision, refers to 'a defendant's request for payment' and not to 'civil actions for FCA violations.'" (quotation and citation omitted)). During the trial, this Court held in accordance with its sister courts that the pre-amendment version of the statute would apply and instructed the jury accordingly. Trial Tr. Nov. 8, 2013, A.M. Session at 127:10-18.

MWI raises several arguments that the Court will address in turn. However, many of MWI's arguments ask the Court to "make credibility determinations or weigh the evidence," which it is not permitted to do. Reeves, 530 U.S. at 149; Estate of Mark Parsons v. Palestinian Auth., 651 F.3d 118, 124 (D.C. Cir. 2011) ("Sorting out . . . contradictions [and] deciding how much weight to give evidence that supports or undermines [a party]'s case . . .are prototypical jury functions that courts may not commandeer."). Likewise, the Court will not revisit its prior legal conclusions, which were unaffected by the evidence introduced at trial. Cf. Feld v. Feld, 688 F.3d 779, 782-83 (D.C. Cir. 2012) (holding that Rule 50 motions are not required to preserve purely legal claims for appeal).

## A.    There Was Sufficient Evidence to Support the Jury's Finding that the 58 Supplier's Certificates Were "Claims"

MWI argues that Plaintiffs failed to introduce any evidence that the Supplier's Certificates were "claims for payment" as defined by the FCA. Renewed Mot. at 45. The FCA defines "claim" to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any of the money or property which is requested or demanded, or if the Government will reimburse such contractor,

-9-

grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c). "A submission need not be an actual invoice to be a 'claim' or 'statement' under the Act.'" <u>United States ex rel. Schwedt v. Planning Research Corp.</u>, 59 F.3d 196, 199 (D.C. Cir. 1995).

Earlier in this litigation, MWI argued that, as a matter of law, "submissions made in connection with efforts to obtain Government loans cannot be treated as false claims under the FCA." Def. MWI Corp.'s Mot. for Clarification at 6 [Dkt. No. 230]. Judge Urbina rejected that argument, and granted the Government's Motion for Summary Judgment on the issue of the existence of claim and the issue of presentment. First MSJ Opinion, 520 F. Supp. 2d at 174 n.6; <u>see also</u> Order of March 20, 2008 (granting Plaintiff's Motion for Partial Summary Judgment on the FCA elements of "the existence of a claim" and "presentment of a claim to the government") [Dkt. No. 233].

Indeed, MWI acknowledged prior to trial that Judge Urbina had resolved the issue of whether or not a "claim" existed. Def. MWI Corp.'s Mot. for Clarification at 6 ("[T]he 'claim' element under the Government's FCA claims no longer remains for resolution at trial."). Accordingly, the Court instructed the jury that the Supplier's Certificates in this case were "claims" under the False Claims Act and that the jury could assume that

-10-

"each of those documents is a 'claim' for payment." Trial Tr. Nov. 21, 2013, A.M. Session at 35:16-19. Thus, Plaintiffs did not have to introduce evidence as to the "claim" element at trial.[5]

## B. There Was Sufficient Evidence to Support the Jury's Finding that MWI's Claims Were False

Plaintiffs' theory of falsity was that MWI's certifications on its Supplier's Certificates were false because it attested that it paid only "regular commissions." Complaint ¶ 15; Trial Tr. Nov. 21, 2013, A.M. Session at 36:10-17. Consequently, in order to ascertain whether the claims were false, the jury had to evaluate whether the commissions MWI paid to Indimi were "regular."

Because the jury found that the 58 Supplier's Certificates were false claims, it necessarily found that the Indimi commissions were not "regular." Sufficient evidence was introduced to support the jury's finding.

---

[5] The jury was required to identify the number of false claims and/or false records or false statements, if it found liability. Trial Tr. Nov. 21, 2013, A.M. Session at 35:16-19; see also United States ex rel. Miller v. Bill Harbert Intern. Const., Inc., Case No. 95-1231, 2007 WL 851868, at *2 (D.D.C. March 14, 2007) ("The jury's job in this case will be to determine the number of violations and fix the amount of actual damages, if any."). Plaintiffs introduced evidence that there were 58 Supplier's Certificates, and the jury found accordingly. Pls.' Ex. 283 (8 Letter of Credit Supplier's Certificates); Pls.' Ex. 284 (50 Disbursement Supplier's Certificates); Verdict at 1-2 [Dkt. No. 453] (identifying 58 false "claims" and 58 "false records and false statements").

The strongest evidence that the commissions paid to Indimi were not regular was the sheer amount of money paid to Indimi. Between 1992 and 1994, the commissions paid to Indimi dwarfed those paid to other MWI agents. Def.'s Ex. 500 ($26,070,181 was paid in 8 commissions to Indimi; $1,744,537 was paid in 48 commissions to all other agents). Between 1980 and 1995, MWI paid $51,986,394 in 23 commissions to Indimi. Id. The other 130 commissions to MWI's other sales agents add up to approximately $3.6 million dollars combined. Id.

Of the largest 21 commissions paid between 1980 and 1995, Indimi received 19 of them. Id. His largest commission, in April of 1985, was $12,750,149 (almost four times as much as MWI paid all other sales agents over 15 years). Id.

MWI argues that the total dollar amount of the commissions is misleading. Renewed Mot. at 21. However, in addition to the high dollar amount Indimi received, the percentage of the total sales that he received in commissions was far higher than the percentages given to other MWI sales agents. Eighteen of the 153 commissions MWI paid between 1980 and 1995 were above 30% of the sales price, and 15 of those went to Indimi. Def.'s Ex. 500.

MWI emphasizes that three other commission percentages were higher than 30% of the sales price, Renewed Mot. at 11, but those commissions were comparatively small. Def.'s Ex. 500

(commissions of $26,624 (Feb. 2, 1990), $23,387 (July 22, 1980), and $16,839 (August 13, 1982)). Importantly, as Rita Rodriguez testified, commission percentages often have to be higher when the total sale amount is lower. Test. of Rita Rodriguez, Trial Tr. Nov. 14, 2013, A.M. Session at 89:24-90:6; see also Test. of Thomas Roegiers, Nov. 19, 2013, A.M. Session at 111:6-10 (testifying that "there's no sense in" comparing commission amounts on separate sales "without also comparing the sales value").

In addition, the average percentage of sales price paid to MWI sales agents in commissions between 1992 and 1994 was approximately 10%, but Indimi's average percentage of sales price was 33.9%. Def.'s Ex. 500. Similarly, the average percentage of sales price paid to MWI sales agents between 1980 and 1995 was 14.68%, but Indimi's average percentage of sales price was 33.71%. Id.

Thus, the evidence supports the jury's finding that the commissions were "irregular" because the Indimi commissions were generally much higher than the commissions paid to MWI's other agents, both in total amount and in percentage of sales price.

Moreover, the evidence that Indimi was paid commission percentages between 26% to 37% was particularly significant because multiple Ex-Im employees testified that they expected

-13-

commissions to be "in the lower than 5 to around 10 percent area." Hess Dep. 60:18-22, Sept. 22, 2004;[6] see also Test. of Rita Rodriguez, Trial Tr. Nov. 14, 2013, A.M. Session at 75:15-16, 76:14-19 (testifying that 5% was standard, and that anything over 8% or 10% would be unlikely to be approved). This statement correlates with the testimony given by MWI employee Juan Ponce that Ex-Im expected its commissions to be no more than 5%. Test. of Juan Ponce, Trial Tr. Nov. 13, 2013, A.M. Session at 22:1-10.

Ex-Im employees also testified that commissions of either the percentage of sales price or the total dollar amount paid to Indimi were unquestionably "irregular" and far outside the scope of anything they had ever seen. See, e.g., Test. of David Chavern, Trial Tr. Nov. 12, 2013, A.M. Session at 83:10-18, 88:24-89:9 (testifying that if a commission of either 24% or 35% had been disclosed, the bank would not have approved the disbursement); Test. of Leilani Lansing, Trial Tr. Nov. 12, 2013, P.M. Session at 48:2-3, 51:7-16, 51:20-21, 52:23-25, 84:13-23 (referring to the total amount paid to Indimi in commissions on all of the sales as "huge compared to the amount of the sale, and also the percentage," "absurd," an "outrageous amount," and "far beyond the range of anything reasonable");

---

[6] An edited version of Hess's Sept. 22, 2004, deposition was played for the jury on Nov. 8, 2013. See Trial Tr. Nov. 8, 2013, P.M. Session at 10:14-15, 10:23-24.

-14-

Test. of Rita Rodriguez, Trial Tr. Nov. 14, 2013, A.M. Session at 29:21-37:21 (testifying that even the lowest commission percentage, 24%, would be found irregular because she did not "know of any industry in any country that regularly pays that kind of commission legitimately" and noting that it would be "astounding" and "unbelievable" that anyone would suggest that the Government should finance such a transaction). In sum, the Government submitted ample evidence supporting the jury's finding that the commissions paid to Indimi were not "regular," and, thus, MWI's certifications to the contrary were false.[7]

MWI raises several arguments regarding the jury's finding of falsity, but none of the arguments meaningfully challenges the sufficiency of the evidence. First, MWI argues that the language of the Certificates was so vague and ambiguous as to negate a finding of falsity. In 2007, Judge Urbina rejected this argument. First MSJ Opinion, 520 F. Supp. 2d at 176-77 ("Under

---

[7] MWI emphasizes that William Brickhill and other Ex-Im employees indicated that certain factors, including difficult country conditions, the exclusivity of the agent, or the longevity of the agent's tenure, may have been relevant to whether a commission was "regular." Renewed Mot. at 19-20; Renewed Reply at 4, 9-10. MWI neglects to note, however, that these witnesses testified that these factors would have been relevant to Ex-Im's analysis of whether or not to continue with the transaction after an irregular commission was disclosed, not whether the commission should have been disclosed in the first instance. See, e.g., Test. of David Chavern, Trial Tr. Nov. 12, 2013, A.M. Session at 116:24-118:17; id. Trial Tr. Nov. 12, 2013 P.M. Session at 19:14-21; Test. of Leilani Lansing, Trial Tr. Nov. 12, 2013, P.M. Session at 75:12-78:19.

these standards, the court concludes the regulation here is sufficiently clear to put exporters on notice of the type of commissions required to be disclosed."). This conclusion was included in the instructions to the jury. See Trial Tr. Nov. 21, 2013, A.M. Session at 36:22-27 ("For purposes of determining falsity, you may not consider whether MWI knew this definition or whether MWI had a different interpretation of the term 'regular commission' or whether the term 'regular commission' was vague or ambiguous.").

Despite being specifically foreclosed from pursuing this theory, MWI now raises the same argument, couched in the language of "objective standards." Renewed Mot. at 4-10. However, the basis of its theory is the same - that the language of the Certificates provides so little guidance that no commission could be said to be "regular" or "irregular." Id. at 4 (arguing that Government failed to show the commissions "could be objectively adjudged to be regular or irregular under the circumstances here").[8] This legal argument has been rejected repeatedly by this Court and MWI has failed to raise any "intervening change of controlling law[] or new evidence,"

---

[8] The Court notes that MWI did not raise its "objective standard" argument in its Rule 50(a) Motion, and, consequently, even if it had merit, the argument was waived. Beyene, 958 F. Supp. 2d at 249 (citation omitted); see also Whelan v. Abell, 48 F.3d 1247, 1251 (D.C. Cir. 1995) (movant who omits theory from Rule 50(a) motion waives theory as basis for Rule 50(b) motion).

<u>Alliance for Cannabis Therapeutics v. D.E.A.</u>, 15 F.3d 1131, 1134 (D.C. Cir. 1994), that would justify revisiting the Court's conclusion. Therefore, the Court will simply reiterate that the language of the Supplier's Certificate was not so ambiguous as to prevent a finding of falsity.

Second, MWI argues that the Government failed to introduce evidence of the relevant "industry standard." Renewed Mot. at 14-17. In 2007, Judge Urbina found that "Ex-Im's interpretation of 'regular commissions' as referring to industry-wide benchmarks is not only 'consistent' with the underlying term but is finely attuned to its context and purpose." First MSJ Opinion, 520 F. Supp. 2d at 177. Thus, the Court instructed the jury that, "[t]he term 'regular commissions' refers to commissions normally and typically paid by the exporter and its competitors in the same industry." Trial Tr. Nov. 21, 2013, A.M. Session at 36:20-22.

MWI now argues that because the instruction to the jury defined regular commissions as "commissions normally and typically paid by the exporter <u>and</u> its competitors in the same industry," <u>id.</u> (emphasis added), the Government was required to introduce specific evidence of commissions paid both by MWI and by MWI's industry competitors to meet its burden on the element of falsity. Revised Mem. at 14-17.

-17-

The Court disagrees. The intent of this instruction was to provide some guidance to the jury as to the scope of the "regular commissions" inquiry, not to establish an evidentiary requirement. At no point has this Court ever held that the Government could not prove falsity unless it proved by a preponderance of the evidence exactly what the industry standard was for commission payments on the sale of pumps in Nigeria.[9]

Moreover, the objection is unavailing because the Government submitted evidence to the jury to enable them to make reasonable inferences about the commissions normally and typically paid in the industry. See Beyene, 958 F. Supp. 2d at 249 (noting that court must draw all reasonable inferences in favor of non-moving party). Namely, evidence was submitted that, in markets where there was competition, MWI's commissions were limited to "10 percent or less." Test. of Juan Ponce, Trial Tr. Nov. 13, 2013, A.M. Session at 29:23-30:6; see also id. at 31:9-18 (in markets with competition, "[s]ometimes commissions cannot be any more than 5 percent"). This testimony corresponds with MWI's own commissions data. See, e.g., Def.'s Ex. 500 (commissions percentages in Europe between 1980 and 1995 were

---

[9] Indeed, Judge Urbina noted in an earlier opinion, "the precise metes and bounds of the 'relevant industry' cannot be defined with mechanical precision." Second MSJ Opinion, 824 F. Supp. 2d at 27 n.6 (rejecting MWI's argument that difficulty of defining relevant industry insulated them from liability).

5%-10%; average commission in Central American between 1992 and 1994 was 8%). Evidence was presented that the pump industry standard was to keep prices low by keeping commissions low.

Ponce's testimony also explained why the Government did not have specific evidence about commission payments paid by competitors selling irrigation pumps in Nigeria – there were no such competitors. Test. of Juan Ponce, Trial Tr. Nov. 13, 2013, A.M. Session at 30:11-17 ("The Hydraflo pump was a proprietary equipment, and even though we had some competition later on, but we were basically alone in the market with this particular product."); see also id. at 29:23-30:6, 31:1-7. Because there were no direct competitors, it would have been impossible for the Government to submit specific evidence about what competitors paid in commissions for similar products.

In sum, the Government submitted sufficient evidence as to how the industry generally functioned to constitute a "legally sufficient evidentiary basis for a reasonable jury to find" that Indimi's commissions were irregular compared to those generally paid in the industry. Reeves, 530 U.S. at 149.

Third, MWI argues that the jury could not find that the Indimi commissions were irregular as compared to its other commissions because all of its commissions were calculated using the same formula. Renewed Mot. at 17-23; Renewed Reply at 7;

Def.'s Ex. 533. This formula set a commission of 10% of the base price. Def.'s Ex. 533. The agent would then also receive half of any sales amount received over the base price. Id.; see also Test. of Cornelius Lang, Trial Tr. Nov. 14, 2013, P.M. Session at 47:20-48:12.

MWI insists that its "neutral" application of this formula to all sales is nonrebuttable evidence of regularity. Revised Mem. at 11-12. However, the Government submitted evidence that explained how the lack of competition in Nigeria affected the sales price and application of the commissions formula in important ways.

Because there were no competitors selling similar pumps in Nigeria, there were no market forces to ensure that MWI's prices or commissions were not inflated. Ponce testified that the lack of competition in Nigeria permitted MWI "to put the high commissions into the price of the pumps." Test. of Juan Ponce, Trial Tr. Nov. 13, 2013, A.M. Session at 16:9-10; see also id. at 83:18-20 ("[T]he fact that we had no competition, so we were able not only to pay Indimi the high commissions, but also to have very high profits for the company.").

The evidence showed that Indimi sold his products to Nigeria at between 168% of the base price and 296% of the base price. See Def.'s Ex. 533 (setting forth formula for calculation

-20-

of commissions); Def.'s Ex. 500 (listing commissions and sales prices). On average, Indimi's sales were close to 250% of the base price. Id. In comparison, sales of other salespeople between 1992 and 1994 were an average of 102% of the base price. Id.

Consequently, the fact that Indimi's high commissions were calculated according to a formula does not make the commissions "regular" because the formula was applied to irregular, inflated prices. Although companies are free to charge whatever prices they can get in the private market, the Ex-Im's purpose is to finance sales made on a commercially-based basis. Hess Dep. 100:2-10, Sept. 22, 2004. As the Ex-Im witnesses testified consistently, the purpose of requiring disclosures of high commissions is, at least in part, to assure that the Bank invests in projects where the "products are priced correctly." Test. of David Chavern, Trial Tr. Nov. 12, 2013, A.M. Session at 109:5-14; see also id. at 66:1-6 (stating that Ex-Im would not want situation where "the amount of lending that the bank is doing is in excess of what's needed to actually buy the product"); Test. of Leilani Lansing, Trial Tr. Nov. 12, 2013, P.M. Session at 52:4-13 (noting that disclosure of high commission rate "would raise in my mind the question as to whether we approved the loan for the wrong amount").

In sum, the jury had a sufficient evidentiary basis to reject MWI's argument that its application of a consistent formula to all its commissions made these irregular transactions, and the irregularly high commissions that accompanied them, "regular" for purposes of procuring Ex-Im financing.

Fourth, MWI argues that the Indimi commissions were "regular" because they were consistent with the commissions it had been paying to Indimi for years. Revised Mem. at 12. MWI argued this theory to the jury, and the jury rejected it. It was certainly not unreasonable for the jury to conclude that MWI's exorbitant commissions to Indimi were not "regular" simply because it had paid him similarly exorbitant commissions for years. There is simply no basis for the Court to overturn this finding. See Estate of Mark Parsons, 651 F.3d at 124.

Finally, MWI argues that the Government inappropriately argued that the many unconventional ways in which Indimi received his commissions was evidence of irregularity. Renewed Reply at 13.[10] Contrary to MWI's insistence that the Government

---

[10] For example, MWI and its employees paid Indimi's personal expenses and then deducted the payments from future commissions at no cost; paid for Indimi's lawn, pool, cable, cleaning, phone, and water services; paid Indimi's $43,000 American Express bill; made numerous cash advances to Indimi; gave Indimi large advances on his commissions; provided Indimi with no-interest loans; helped Indimi sell his home; reimbursed Indimi's

never raised this theory before trial, this Court ruled on a Motion in Limine that the Government's evidence regarding Indimi's cash payments and advances were "directly relevant to the central factual issues in this case of whether Defendant's certifications with the Ex-Im Bank were false and whether the Indimi commissions were 'regular.'" Order on Motion in Limine 12 at 1 [Dkt. No. 384]. Consequently, MWI was on notice that the Government would argue that the many free services offered by MWI to Indimi were indications that his commissions were not "regular," and that evidence was properly admitted.

In sum, the Government presented a "legally sufficient evidentiary basis" for the jury to find that the commissions

___

wife for summer school expenses; provided Indimi with a company plane; and acted as Indimi's power of attorney. Test. of David Eller, Trial. Tr. Nov. 8, 2013, A.M. Session at 80:9-81:3, 84:10-16, 85:7-88:2; Test. of Cornelius Lang, Trial Tr. Nov. 14, 2013, P.M. Session at 14:12-15:22, Test. of Judith Ennis, Trial Tr. Nov. 14, 2013, P.M. Session at 66:17-67:9, 69:9-74:12, 76:7-77:6, 79:6-84:1, 89:3-91:5. Even though many of these payments and services were deducted from Indimi's commissions, the evidence showed that, in general, MWI's other sales agents did not receive such perks. Test. of Judith Ennis, Trial Tr. Nov. 14, 2013, P.M. Session at 92:2-4 (in 27 years with the company, could not remember MWI paying the personal expenses of any other sales agent); id. at 96:23-97:10 (noting that, after deposition, she had found two examples of another agent receiving advances against commission).

paid to Indimi were not regular, and, thus, that MWI's certifications were false.[11] Reeves, 530 U.S. at 149.

### C. There Was Sufficient Evidence to Support the Jury's Finding that MWI Acted With the Requisite Scienter

For both counts, the Government needed to prove that MWI acted "knowingly." The Court instructed the jury: "Under the False Claims Act, knowingly means that, with respect to the allegedly false or fraudulent information, a defendant had actual knowledge of the information; . . . or acted in deliberate ignorance of the truth or falsity of the information, or acted in reckless disregard of the truth or falsity of the information." Trial Tr. Nov. 21, 2013, A.M. Session at 37:3-12.

---

[11] MWI also argues that it is entitled to judgment as a matter of law on the Government's "second, separate theory of falsity." Renewed Mot. at 24. MWI insists that the Government alleged in its Complaint that the commissions were also irregular because they included payments to Nigerian state officials. Renewed Mot. at 24-29. The Government did not address this issue in its Opposition, and, thus, it may be treated as conceded. Hopkins v. General Bd. of Global Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). This concession is of little import, however, because, even if this was a separate theory of falsity, Defendant acknowledges it was an alternate Government theory of falsity. Renewed Mot. at 24. Because the Government submitted sufficient evidence to support the jury's finding that the commissions were irregular based on the size of Indimi's commissions, its failure to prove that Indimi used the commission money to pay Nigerian state officials provides Defendant no relief from the verdict.

There was ample evidence to support a finding that MWI acted with, at a minimum, reckless disregard. See United States v. Sci. Appl. Int'l Corp., 653 F. Supp. 2d 87, 97 (D.D.C. 2009) (noting that jury had to find defendant acted "with actual knowledge, or at least reckless disregard or deliberate ignorance of the truth or falsity of its claims") (emphasis added), reversed in part on other grounds, 626 F.3d 1257 (D.C. Cir. 2010).

For example, Ponce testified that MWI employees knew that the commissions MWI was paying to Indimi were much higher than those being paid to agents in other countries. Test. of Juan Ponce, Trial Tr. Nov. 13, 2013, A.M. Session at 15:25-16:7, 29:1-7, 33:10-15. James Hess testified that MWI "should have been fully aware" that the purpose of the Supplier's Certificates was to ascertain whether nonregular commissions that could be indicative of "noneconomic decisions by the purchaser of the products" were being paid. Hess Dep. at 46:5-17, Sept. 22, 2004. The jury could have concluded, based on this testimony, that MWI acted with reckless disregard when it certified that commissions constituting 26%-37% of the sales prices were "regular." See United States ex rel. K & R Ltd. P'ship v. Massachusetts Hous. Fin. Agency, 530 F.3d 980, 983 (D.C. Cir. 2008) (observing that reckless disregard under FCA is

-25-

an "extreme version of ordinary negligence") (quotation and citation omitted); United States v. Bourseau, No. 03-907, 2006 WL 2961105, at *13 (S.D. Cal. Sept. 29, 2006) ("[A] provider that fails to inform itself of the reimbursement requirements acts in reckless disregard of the truth of its claims."), aff'd, 531 F.3d 1159 (9th Cir. 2008).

In addition, MWI employees testified that Eller personally approved every commission MWI paid, including Indimi's commissions. Test. of Thomas Roegiers, Trial Tr. Nov. 19, 2013, A.M. Session at 20:9-23; Test. of Juan Ponce, Trial Tr. Nov. 13, 2013, A.M Session at 9:22-10:8, 14:14-21. Eller testified that he could not remember MWI ever paying any other agent a commission of more than $5 million, far less than the largest commission Indimi received, $12.75 million. Trial Tr. Nov. 8, 2013, A.M. Session at 120:11-22; Def.'s Ex. 500. Eller signed the majority of the Supplier's Certificates declaring that no irregular commissions had been paid, even though he knew that Indimi's commissions were significantly higher than MWI's average commission rates. This evidence supports a finding of reckless disregard. See United States v. Krizek, 111 F.3d 934, 942 (D.C. Cir. 1997) (upholding district court's determination that failure to verify and review false submissions rose to level of reckless disregard).

Moreover, this Court has already noted that there was evidence that Eller had actual knowledge that the commissions should have been disclosed. Judgment Opinion, 2014 WL 521524, at *11. Ponce testified that MWI employees were informed that the Ex-Im expected commissions to be no more than 5 percent. Test. of Juan Ponce, Trial Tr. Nov. 13, 2013, A.M. Session at 21:20-22:10. He testified that, "we knew that we were violating . . . the rules. We just hoped that we would never get caught." Id. at 35:3-4.[12] Thus, the Government submitted sufficient evidence to the jury for it to find that MWI's certifications were made with actual knowledge of falsity.[13]

---

[12] MWI emphasizes that Ponce's testimony alludes to a need to disclose all commissions, not just irregular commissions. Renewed Mot. at 32 (citing Test. of Juan Ponce, Trial Tr. Nov. 13, 2013, A.M. Session at 63:15-64:3); Renewed Reply at 16. However, in combination with Ponce's testimony that Eller, Roegiers, Lang, and Bucknam knew and "had the same concern" and that there were conversations about that concern, the testimony still supports the jury's finding of scienter. Test. of Juan Ponce, Trial Tr. Nov. 13, 2013, A.M. Session at 33:16-34:23.

[13] MWI insists that the Court must credit Eller's testimony that he had a discussion with Marvin Solomon ("Solomon") of the Export-Import Bank ("Ex-Im") regarding the Supplier's Certificates in which Solomon told him that the Bank "do[es] not get involved in commission levels." Renewed Mot. at 43 (citing Test. of David Eller, Trial Tr. Nov. 8, 2013, A.M. Session at 120:22-122:1); Renewed Reply at 23. Mr. Eller's credibility was highly contested at trial. Pls.' Closing Arg., Trial Tr. Nov. 21, 2013, A.M. Session 70:1-73:4 (arguing that Eller testimony about Solomon was both internally inconsistent and directly contracted by the testimony of others); see also Trial Tr. Nov. 8, 2013, A.M. Session at 63:19-21; 124:1-17 (Government impeachment of Eller's testimony compared to deposition

All of MWI's arguments ask the Court to "make credibility determinations or weigh the evidence," which of course it is not permitted to do. <u>Reeves</u>, 530 U.S. at 149; <u>Estate of Mark Parsons</u>, 651 F.3d at 124. For example, MWI argues that its evidence that it interpreted the term "regular commissions" reasonably was so overwhelming that it "negate[d] an inference" of reckless disregard. Renewed Mot. at 35-39. The Court included an instruction specifically informing the jury that it could consider such evidence as relevant to the issue of "knowledge." Trial Tr. Nov. 21, 2013, A.M. Session at 37:3-12 (instructing the jury that in determining whether MWI acted "knowingly," it could "consider whether or not MWI had a reasonable and/or good faith interpretation of the term 'regular commissions' on the Supplier's Certificates"); <u>see also</u> Order on Motion in Limine 4 at 3 [Dkt. No. 397]. Thus, MWI was explicitly permitted to argue that its certifications were based on its reasonable or good faith understanding of the term "regular commissions." <u>See</u> <u>Sci. Applications</u>, 653 F. Supp. 2d at 97 ("A defendant's reasonable interpretation of an ambiguous regulation may well be a successful defense to an alleged FCA violation in appropriate cases.")

---

testimony); Trial Tr. Nov. 8, 2013, P.M. Session, 6:1-7:15 (same).

Thereafter, the jury weighed the evidence and found that MWI's evidence of good faith and reasonable interpretation was not as credible or persuasive as the Government's evidence to the contrary. As discussed above, the Government produced evidence that MWI employees knew that the Ex-Im expected commissions to be much lower than the commission being paid to Indimi,[14] and knew that the commissions being paid to him were significantly higher than those being paid to any other MWI sales agents. Given that the Court must not make credibility findings or weigh the evidence, Reeves, 530 U.S. at 149, it is clear that MWI's argument about the "reasonableness" of their interpretation is without merit.

MWI's other arguments similarly reiterate the same arguments it made to the jury in its closing argument. In doing so, it misstates the role of this Court, which is only to decide whether sufficient evidence was presented to the jury on each element. The jury was presented with MWI's evidence and arguments at trial, and was not persuaded by them. Given the sufficiency of the Government's evidence to support the jury's finding of scienter, MWI's insistence that the jury should have

_____

[14] This distinguishes this case from K & R Ltd., 530 F.3d 980, wherein plaintiffs could not point to any evidence that might have warned Defendant that its interpretation of a particular term was incorrect. Id. at 983 (quoting Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 70 (2007)).

interpreted the evidence differently cannot support a reversal of the verdict.

## IV. CONCLUSION

After a careful review of the record, the Court concludes that there was a "legally sufficient evidentiary basis for a reasonable jury to find" for Plaintiffs. <u>Reeves</u>, 530 U.S. at 149. Consequently, Defendant has failed to establish that "reasonable men and women could not have reached a verdict in plaintiff's favor," <u>Nelson</u>, 953 F. Supp. 2d at 130, and its Motion for Judgment as a Matter of Law [Dkt. No. 443] and its Renewed Motion for Judgment as a Matter of Law [Dkt. No. 478] shall be **denied.**

An Order shall accompany this Memorandum Opinion.

June 25, 2014

Gladys Kessler
United States District Judge

**Copies to:** attorneys on record via ECF